**Dondi J. COOK, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–7565.**

Court of Appeals of Alaska.

Oct. 26, 2001.

Rehearing Denied Dec. 18, 2001.

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Dondi J. Cook appeals his conviction for first-degree stalking (stalking committed by acts that violated a domestic violence protective order).[1] He argues that the case against him should be dismissed with prejudice because he was not brought to trial within the time limits of Alaska Criminal Rule 45. In the alternative, Cook argues that he should receive a new trial because his trial judge was biased against him, or created a reasonable appearance of being biased against him, and thus should have been removed from the case.

---

1. AS 11.41.260(a)(1).

In addition, Cook argues that his trial was flawed because (1) the judge gave the jury a misleading instruction on the elements of stalking, (2) the judge failed to require the jury to reach unanimous agreement on what exactly Cook did to merit a stalking conviction, (3) the judge improperly required the defense attorney to apprise the jury of a clause in a restraining order that was less favorable to Cook's position than another portion that the defense attorney had just read, (4) the judge violated Alaska Evidence Rule 404(b) by allowing the State to introduce evidence of Cook's other wrongful acts when this evidence had no relevance other than to show Cook's bad character, and (5) the judge allowed the prosecutor to engage in improper argument during summation.

Finally, Cook argues that we should modify the *Austin* rule (a rule limiting the sentences that first felony offenders may ordinarily receive for class B and class C felonies). The *Austin* rule currently focuses primarily on the amount of jail time that a defendant is required to serve (as opposed to jail time that is suspended). Cook contends that we should expand the rule so that a defendant's suspended jail sentence is also taken into account, particularly when the defendant receives a substantial amount of time to serve.

For the reasons explained here, we reject each of Cook's claims and we affirm his conviction.

*Synopsis of the facts*

Dondi Cook had a romantic relationship with K.A.B., but this relationship soured and K.A.B. broke off the relationship. Despite the fact that their romantic connection had ended, K.A.B. and her three minor children continued to live with Cook in Fox during the summer of 1998. As the summer progressed, Cook began to display moods and conduct that frightened K.A.B.; she feared not only for her own safety, but also for the safety of her children.

In the fall of 1998, Cook's mood swings became progressively worse, so K.A.B. made plans to move out of the house. According to K.A.B., Cook became suicidal and threatened to kill both himself and his dog. In fact, on one occasion he asked K.A.B.'s oldest daughter, K.B., to pull the trigger of his shotgun while the barrel of the weapon was in his mouth.

Later that evening, after Cook had calmed down, K.A.B. agreed to go into Fairbanks with him. They visited several of the downtown bars. Although Cook had previously agreed that they would call a cab if they consumed too much alcohol, Cook became upset when K.A.B. insisted that they call a cab. He assaulted K.A.B. while they were arguing over this matter. When K.A.B. ran inside one of the bars to call a cab, Cook followed her. He threatened to report her to the Division of Family and Youth Services (*i.e.*, to report that she was neglecting her children, so that DFYS would take them). After K.A.B. called a cab, she telephoned her children and told them that she and they were moving to a women's shelter, so they should get ready to go.

When K.A.B. returned to the house that she shared with Cook, he threatened her and tried to block her from leaving. As K.A.B. and her children were leaving in the cab, Cook tried to stop the cab from departing. He jumped on the hood of the vehicle, held onto the windshield wipers, and smashed the windshield with a rock.

On the day after K.A.B. arrived at the shelter, she obtained an *ex parte* twenty-day domestic violence protective order against Cook. This order prohibited Cook from having any contact with K.A.B. except through the courts, an attorney, or by mail. Twelve days later, on October 27, 1998, K.A.B. obtained a six-month protective order against Cook. (Cook was present at this hearing.) The October 27th order contained the same restrictions as the earlier one, and it additionally forbade Cook from approaching within 100 feet of K.A.B. or

> [from] telephon[ing], contact[ing], or otherwise communicat[ing] directly or indirectly with [K.A.B.] except: through an attorney or by U.S. mail.

As will be explained later in this opinion, this clause became the subject of dispute at Cook's trial.

Cook began staying with Danny Ore, who was a friend of both Cook's and K.A.B.'s. Cook convinced Ore to act as a "go-be-tween"—to tell K.A.B. that Cook wanted to talk to her and get back together. In late November, Ore brought K.A.B. a stack of mail that he had been collecting for her. Along with the mail, Ore delivered an envelope that contained Cook's ponytail, a box containing jewelry that Cook had purchased for K.A.B., and a letter from Cook. (This letter did not contain a postmark; it apparently had never been sent through the mail.) In his letter, Cook asked K.A.B. to come back to him, and he asked her to marry him.

In December, K.A.B. and her children were visiting Ore when one of K.A.B.'s children discovered a letter that Cook had written to K.A.B.; this letter was hidden in a box of Legos that was being stored at Ore's house. In this letter, dated October 27, 1998 (the day on which the six-month protective order was issued), Cook told K.A.B. that he still loved her.

K.A.B. subsequently moved into an apartment and obtained an unpublished phone number. Just before Christmas, Ore told K.A.B. that Cook wanted to spend the holidays with her and her children, and that Cook wanted to speak to her. Beginning at 2:00 a.m. the following day, Cook left a series of seven telephone messages for K.A.B.; some of these were also directed toward K.A.B.'s younger daughter. K.A.B., accompanied by Ore, went to the police station the next morning to report these calls. Cook called again while K.A.B. was at the police station.

On December 22nd, the police arrested Cook for violating the October 27th protective order. Following his arrest, Cook again violated the protective order by calling K.A.B. from jail.

Cook was charged with first-degree stalking, AS 11.41.260(a), for his non-consensual contacts with K.A.B. and her children between October 27th and December 22nd—i.e., the contacts that occurred after the issuance of the six-month domestic violence pro-

tective order. On February 22, 1999, while he was still in jail on this charge, Cook violated the protective order again by sending K.A.B. a letter in which he once more protested his love for her and his desire to reconcile with her.

In early April 1999, Cook and the State informed Fairbanks Superior Court Judge Richard D. Savell that they had reached a plea and sentence agreement. Cook pleaded no contest in the expectation that he would receive a sentence of 1 year's imprisonment, all suspended except the time he had served. But seven weeks later, on May 21st, Judge Savell rejected the proposed sentencing agreement because he believed that it was too lenient. On June 4th, Cook decided to withdraw his plea and go to trial. Cook's trial commenced on August 2nd. The jury found Cook guilty. Judge Savell sentenced Cook to 2 years and 8 months' imprisonment with 1 year and 4 months suspended (*i.e.*, 1 year and 4 months to serve).

### 1. Cook was brought to trial within the time limits of Criminal Rule 45

Under Alaska Criminal Rule 11(e)(1), when the parties reach a plea bargain that limits the court's sentencing discretion, the parties must disclose the agreement to the court. The judge may then ratify the plea agreement, reject the plea agreement, or pursue a third option: conditionally accept the defendant's plea pending receipt of a pre-sentence report. Under this last alternative, after the judge has read the pre-sentence report, the judge either ratifies the plea bargain (in which case the defendant's plea becomes final) or rejects the plea bargain.[2] If the judge rejects the bargain because it is too lenient, the defendant must be given the opportunity to withdraw the plea.[3]

In Cook's case, Judge Savell pursued the third option: he conditionally accepted Cook's no contest plea pending receipt of the pre-sentence report. Ultimately, Judge Savell rejected the proposed sentence agreement. Cook's appeal presents the question of how to calculate the time limit for bringing a defendant to trial under Alaska Criminal

---

**2.** *See* Criminal Rule 11(e)(2)-(3).

**3.** *See* Criminal Rule 11(e)(3).

Rule 45 when, in such circumstances, the defendant chooses to withdraw a Rule 11 plea and go to trial.

Cook was charged with first-degree stalking in late December 1998. A little over three months later, on April 2, 1999, Cook and the State announced to the superior court that they had reached a plea bargain to resolve the case. Cook would plead no contest, and the State would accept a sentencing cap of 1 year's imprisonment, with all of that year suspended except the time that Cook would have served by the date of his sentencing. Cook, for his part, would agree to a two-year term of probation and would further agree to seek mental health treatment.

Judge Savell chose the third option offered by Rule 11(e): he told the parties that he would reserve judgement on the plea bargain until he had seen the pre-sentence report. Judge Savell then advised Cook of his rights pursuant to Criminal Rule 11(c), and Cook pleaded no contest to stalking.

Seven weeks later, at a hearing on May 21st, Judge Savell told the parties that he believed the proposed sentence was too lenient. The judge noted that Cook perceived himself as the victim in the case, that Cook had become more angry since the charges were filed, and that Cook was unwilling to take medication to control his behavior. Judge Savell declared that these factors caused him to have "serious doubts" as to whether the proposed sentence cap would be sufficient to deter Cook from future misconduct. He therefore rejected the plea agreement.

The judge gave Cook two weeks to decide whether to withdraw his no contest plea or to persist in the plea, knowing that his sentence would probably exceed the proposed cap. On June 4th, Cook announced that he would withdraw his plea and go to trial. Cook's trial began fifty-nine days later, on August 2nd.

In *Mustafoski v. State*, 954 P.2d 1042 (Alaska App.1998), this court concluded that the time for bringing a defendant to trial under Criminal Rule 45 restarts at Day 1

whenever a defendant announces the intention to plead guilty or no contest, then changes their mind and renews their demand for a trial.[4] Last year, the supreme court amended Rule 45(c) to codify the *Mustafoski* decision.[5] Rule 45(c)(5) now reads:

*Withdrawal of Plea, or Notice That Defendant No Longer Intends to Enter a Plea of Guilty or Nolo Contendere.* When a defendant withdraws a plea of guilty or nolo contendere, the time for trial shall run from the date of the order permitting the withdrawal. When a defendant who previously informed the court of an intention to plead guilty or nolo contendere notifies the court that the defendant now intends to proceed to trial, the time for trial shall run from the date of that notification.

Cook announced on June 4th that he wished to withdraw his no contest plea and go to trial. Accordingly, it appears that the State had 120 days from June 4th to bring Cook to trial. But Cook argues that neither clause of Rule 45(c)(5) governs his case.

Cook asserts that the first clause of Rule 45(c)(5)—which speaks of plea withdrawal—is implicitly limited to pleas that are offered unconditionally. Cook contends that this clause does not apply to pleas that are offered subject to the court's approval of a sentencing bargain under Criminal Rule 11(e). Likewise, Cook asserts that the second clause of Rule 45(c)(5)—dealing with renunciations of a previously announced intention to plead guilty—does not govern his case either. According to Cook, this clause also is implicitly limited to a defendant's announced intention to plead guilty unconditionally.

■ We are unpersuaded by Cook's argument. Both *Mustafoski* and Criminal Rule 45(c)(5) are premised on the concept that a defendant's right to a speedy trial under Criminal Rule 45 is satisfied when the defendant announces the intention of pleading guilty at a future time. That is, the State's obligation to bring the defendant to trial within the time limit specified in Rule 45 *is met* when the defendant announces a willing-

---

4. *See id.* at 1044.

5. *See* Supreme Court Order No. 1383, effective April 15, 2000.

ness to forego the right to a trial. As we said in *Mustafoski,*

> When Mustafoski told the court ... that he intended to change his plea, Rule 45 was satisfied. For Rule 45 purposes, Mustafoski's announcement that he intended to change his plea had the same effect as an entry of plea. [Citations omitted] That is, the running of Rule 45 was terminated on [the day of Mustafoski's announcement].

*Mustafoski,* 954 P.2d at 1044. This is why Rule 45 restarts (begins running at Day 1) when a defendant later renounces their intention to plead guilty and re-asserts their right to a trial.

If Rule 45 is satisfied when a defendant announces that they intend to plead guilty in the future, it makes little sense to have a different rule when a defendant enters a plea under Criminal Rule 11(e). Under Rule 11(e), not only does the defendant offer an immediate plea of guilty, but the court goes through the formal procedure of having the defendant waive the rights to jury trial, to confrontation of the government's witnesses, to presentation of evidence in their own behalf, and so on. These formalities are required because, if the judge accepts the proposed sentencing agreement, the defendant is bound by the plea.

True, the defendant's plea is conditional in the sense that the defendant has a right to withdraw the plea if the judge ultimately rejects the proposed sentencing agreement. But we take judicial notice that, in the great majority of cases, the court accepts the proposed sentencing agreement (or accepts it with modifications to which the parties agree). As Cook acknowledges in his opening brief to this court, "[r]ejection of a Rule 11 agreement is not a normal occurrence."

Even leaving this aside, the fact remains that a defendant's informal announcement of an intention to plead guilty at some future time is at least as conditional as a defendant's entry of plea under Criminal Rule 11(e). For instance, in *Mustafoski,* the defendant told the court that he intended to change his plea, but he wanted to delay

entering the plea until he could find out whether a conviction would affect his immigration status.[6] The following month, the defendant told the court that he and the State were still negotiating the resolution of the case.[7] After another two months, Mustafoski finally announced that there would be no plea bargain and that the case would go to trial. If this type of conditional intention to plead guilty in the future is enough to satisfy Rule 45 (and *Mustafoski* holds that it is), then a defendant's formal entry of a guilty plea under Rule 11(e) is enough to satisfy Rule 45.

■ For these reasons, we hold that Rule 45 was satisfied on April 2, 1999, when Cook pleaded no contest under Rule 11(e). Because the rule was satisfied by the entry of Cook's plea, Rule 45 restarted at Day 1 after Cook announced on June 4th that he intended to withdraw his plea and go to trial. Cook's trial began eight weeks later, on August 2nd. Thus, Cook was brought to trial within the time specified by Rule 45.

*2. There was no plain error in the jury instruction defining the crime of first-degree stalking*

■ A defendant commits the crime of stalking as defined in AS 11.41.270 if the defendant (1) knowingly engages in repeated acts of non-consensual contact with the victim or members of the victim's family, (2) acting recklessly with regard to the possibility that these repeated contacts would cause the victim to fear that they or a family member would suffer death or physical injury, and if (3) the defendant's conduct in fact caused the victim to have this fear. The State alleged that Cook's conduct constituted first-degree stalking under AS 11.41.260(a)(1) because his acts of non-consensual contact violated a domestic violence restraining order.

(The State also alleged that Cook's conduct constituted first-degree stalking under AS 11.41.260(a)(2)—contact in violation of a condition of bail or probation. Cook was charged with domestic assault under Fair-

---

6. *See id.* at 1044.

7. *See id.*

banks Ordinance 6.307(a)(1) based on his assault on K.A.B. outside the bar. He was also charged with third-degree criminal mischief, AS 11.46.484(a)(1), based on his damage to the cab. As a condition of his bail in these cases—and, later, as a condition of his probation in the domestic assault case—Cook was ordered to comply with the terms of the domestic violence protective order. However, even under this alternative theory of prosecution, the underlying question remained whether Cook's conduct violated the protective order.)

▮ Without pertinent objection from Cook's attorney, Judge Savell gave the jury the following instruction defining the elements of first-degree stalking:

First, that the event in question occurred at or near Fairbanks, in the Fourth Judicial District, State of Alaska, and on or about October 27, 1998, through on or about December 22, 1998;

Second, that Dondi J. Cook knowingly engaged in a course of conduct;

[Another instruction informed the jury that "course of conduct" meant "repeated acts of nonconsensual contact involving the victim or a family member".]

Third, that the course of conduct recklessly placed another person, K.A.B., in fear of death or physical injury to herself or a family member;

Fourth, that the defendant recklessly violated a Protective Order issued under AS 18.16.100–AS 18.16.180 or a condition of probation, release before trial, release after conviction, or parole.

Cook now claims that this instruction constituted plain error in two different ways.

First, Cook asserts that the four listed elements are phrased in such a disjointed manner that there is no obvious connection between the "event" referred to in element one and the "course of conduct" referred to in elements two and three. Similarly, Cook asserts, there is no obvious connection between the "course of conduct" referred to in elements two and three and the violation of

the protective order and conditions of bail and probation referred to in element four.

Second, Cook asserts that the wording of element three failed to communicate the concept that the State was obliged to prove that Cook acted recklessly with regard to whether his conduct might cause the victim to fear death or physical injury. As noted above, element three required the jury to find that "[Cook's] course of conduct recklessly placed another person, K.A.B., in fear of death or physical injury to herself or a family member". Cook points out (correctly) that a "course of conduct" does not act recklessly; rather, it is people who act recklessly. Thus, if element three had been worded more precisely, it would have required the jury to find that Cook acted recklessly with regard to the possibility that his course of conduct would place the victim in fear of death or physical injury to herself or a family member.

But whatever the rhetorical flaws in the jury instruction, the record of Cook's trial clearly shows that these flaws did not affect the jury's deliberations. As we have repeatedly held, potential mistakes (or even acknowledged mistakes) in jury instructions can be cured by the arguments of the parties.[8] In Cook's case, the defense attorney told the jurors that there was really only one issue to be decided: whether Cook acted with reckless disregard of the possibility that his conduct might cause the victim to fear for her safety or the safety of her children. And both the prosecutor and the defense attorney informed the jury of the correct legal test for determining whether Cook acted recklessly.

Early in her opening summation, the prosecutor told the jury that any criminal charge requires proof of a culpable mental state: "The law [specifies] some mental state that has to be in the defendant's mind when he commits [the] crime." In Cook's case, the prosecutor told the jury, the State had to prove that Cook "knew what he was doing" when he engaged in his non-consensual contacts with the victim, and that Cook "was reckless in his disregard for the fact that [his conduct] would cause someone fear".

---

8. See *Braun v. State*, 911 P.2d 1075, 1081 (Alaska App.1996); *Norris v. State*, 857 P.2d 349, 355 (Alaska App.1993); *O'Brannon v. State*, 812 P.2d 222, 229 (Alaska App.1991).

The prosecutor told the jury that the question was two-fold: was the victim's fear reasonable, and did Cook recklessly disregard the effect that his conduct would have on the victim?

*Prosecutor:* [When the victim was] in the middle of [the] situation, and she [didn't] know where it [was] going, was it reasonable for her to be fearful? And was it reckless for Mr. Cook to disregard the fact that anybody would be fearful under those circumstances?

The prosecutor then recited various acts committed by Cook that "would have been [frightening] to anybody under the same circumstances". The prosecutor argued that Cook's conduct made the victim "reasonably fearful" and placed her "reasonably in fear".

During Cook's summation, the defense attorney did not dispute that Cook engaged in the conduct alleged by the State, or that this conduct violated the restraining order (and thus Cook's bail and probation conditions):

*Defense Attorney:* [The prosecutor] has done a pretty good job here of laying things out. The [conduct] that the State has charged [as] stalking [are] the incident of the letter, ponytail, and jewelry; ... the note in the [box of] Legos ...; the phone messages ... right before he was arrested; ... [and the] call ... to [K.A.B.'s home], inquiring about where she was.... Those are the acts [charged].

. . .

As to these things, there really isn't much dispute that those things were actually in violation of a restraining order. Whether Mr. Cook was *aware* of that or not, I'd submit that [that is] up to you.

The defense attorney asked the jury to focus on Cook's mental state and the reasonableness of the victim's fear:

*Defense Attorney:* The questions that I would ask you to be concerned with [are]: Was [Cook's] course of conduct the kind of conduct that recklessly placed [the victim] in fear of death or physical injury [to] herself or a family member? And did those actions recklessly violate a protective order or the conditions of [Cook's] release ... ?

During the second half of her summation, Cook's attorney again conceded that Cook had violated the restraining order. The defense attorney hinged her defense solely on the assertion that the State had failed to prove Cook's recklessness. "[W]hat's really important," she argued, "is that nothing [Cook] did ... would have [made him] aware [that he] would ... cause[ ] her the kind of fear that would bring him before the court today for stalking".

*Defense Attorney:* [L]ove letters, a ponytail [clipping] trying to show love, a note in [her child's box of] Legos apologizing for his behavior, saying he wants to get back together with her—"Please forgive me, I love you all and hope for a chance to prove it."—and the phone calls on December 22nd, again apologizing, saying that he loves and misses them, things like that. Those things are not things that he would have ... had any idea would have caused her fear.

Misguided? Sure. A lot of things ... you've heard show that he's acted in an emotionally unstable way.... But ... he cannot be charged with having had a clue [that] she would be afraid that he was going to hurt her or [any idea that he would] cause her fear.

. . .

He [was] attempting to get back with her, and that may have been a violation of [the] restraining order, and we may not like it. But it wasn't anything that would [foreseeably] have caused her fear.

. . .

There's nothing ... that the State [has] pointed to that can make us think that Mr. Cook would have known about her fear. So we'd submit to you that he was not reckless. He did not recklessly disregard the fact that she might have been afraid. And the definition of "recklessly" is that a person is aware of and consciously disregards a substantial and unjustifiable risk. He wasn't aware of it. He didn't know.

In rebuttal, the prosecutor agreed that the State had to prove Cook's recklessness, but she argued that the evidence proved this element:

*Prosecutor:* "Recklessly" ... [is] when a person is aware of [and] consciously disregards a substantial and unjustifiable risk that the result will occur.... And in this case, the risk would be that [the victim] would be in fear. The risk must be of such a nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

Would a reasonable person in this situation, knowing what [Cook] knew from what he had experienced with her, and what she had communicated to him by telling him to stay away, running away and hiding from him, going to court, filling out paperwork [ ] which says, "I want you to stay away from me"—can you conclude, after that, that [Cook was] aware of the risk and then ... hold him accountable for disregarding that risk? That's what we're asking you to do.

Thus, by the end of the parties' summations, the jury was well aware of the required connection between Cook's conduct, the creation of K.A.B.'s fear, and the violation of the protective order. In addition, the jury had been told repeatedly that the State was obliged to prove (1) that K.A.B.'s fear of death or physical injury was reasonable under the circumstances, and (2) that Cook was aware of and consciously disregarded a substantial and unjustifiable risk that his conduct would engender this kind of fear in K.A.B.

We therefore conclude that, despite the arguable flaws in the jury instruction, these flaws did not affect the jury's deliberations, and thus there was no plain error.

3. *Judge Savell did not commit plain error by failing to require the jury to unanimously agree on precisely what acts Cook committed, or precisely which of these acts violated the protective order, or precisely which of those acts caused K.A.B. to fear for her safety*

Cook argues that the jury's verdict is fatally flawed because the jurors were never in-

structed to reach unanimous agreement on what specific acts of non-consensual contact Cook committed. Cook argues that this error was compounded because, even assuming that the jurors unanimously agreed on what exactly Cook did, the jurors were never instructed to reach unanimous agreement concerning (1) which of Cook's acts of non-consensual contact violated the provisions of the protective order (and thus the conditions of Cook's probation and bail release), or (2) which of Cook's acts of non-consensual contact caused K.A.B. to fear for her safety.

Cook never asked for a jury instruction on these issues, so he must now show plain error. We find no plain error here.

First, as we explained in the preceding section, the defense did not actively dispute the State's allegations of what Cook did, nor did the defense actively contest the State's assertion that Cook's actions violated the protective order. Cook's defense attorney pursued one primary theme: that Cook could not reasonably have anticipated that his actions would cause K.A.B. to fear for her safety or the safety of her children. Because there was no dispute concerning the contours of Cook's conduct, or whether that conduct violated the protective order, we find no plain error in failing to require the jury to specify the exact basis of its conclusion that Cook committed the *actus reus* of first-degree stalking (repeated acts of non-consensual contact in violation of a court order).

This conclusion is, in some respects, foreshadowed by our decision in *State v. Covington,* 711 P.2d 1183 (Alaska App.1985). *Covington* involved a prosecution for repeated acts of sexual abuse of a minor. The victim "was not able to differentiate between various incidents. She testified that she shared a bed with her father during the totality of the time in question, and that they engaged in sexual intercourse almost every night." [9] Covington, for his part, "conceded sharing the bed [with his daughter], but denied that he ever had intercourse with [her]." [10]

The issue in *Covington* was whether the trial judge committed plain error by not ex-

---

9. *Id.* at 1185.

10. *Id.*

plicitly requiring the jury to unanimously agree on specific acts of sexual abuse. This court acknowledged that when "discrete incidents of sexual abuse are charged together in a single count, and impeaching and contrary evidence of differing weight is offered to rebut the several incidents", an instruction on jury unanimity will be necessary for a fair trial because "a real possibility exists that individual jurors will reject some incidents, based upon an evaluation of the impeaching and contrary evidence, but accept other incidents as proven." Thus, even though "[all] twelve jurors may agree that the defendant committed at least one of the incidents, [the jury may] be in general disagreement as to which incident that was." [11]

Nevertheless, we found no plain error in *Covington* because the alleged acts of sexual abuse were undifferentiated: "no impeaching or contrary evidence was more applicable to one incident than another." [12] Rather, the jurors were "faced with a straight question of credibility. Did [they] believe the victim ... or, based on Covington's testimony and the impeachment and contradiction of the victim, did [they] have a reasonable doubt as to the accuracy of the victim's testimony?" [13] Under these circumstances, we concluded, "the record unequivocally establishe[d] that the trial court's error in not requiring the state to elect among incidents, or alternatively, in failing to provide a [unanimity] instruction, did not appreciably affect any verdict against Covington." [14]

On one level, Cook's case resembles *Covington:* The State alleged that Cook engaged in several acts of non-consensual contact with K.A.B.; none of these individual allegations was subject to more impeaching or contradictory evidence than the others; and Cook's theory of defense (lack of recklessness) did not require the jurors to distinguish among the individual allegations. This alone would support the conclusion that the lack of a unanimity instruction did not constitute plain error.

But Cook's case is also different from *Covington* in one key respect. In *Covington,* each of the defendant's individual acts of sexual abuse would have supported a separate charge and conviction; that is, each act was a separate crime. In contrast, the *actus reus* of the crime of stalking is defined as a *series of acts.* The stalking statute requires the State to prove that the defendant engaged in a "course of conduct" comprising "repeated acts of nonconsensual contact". [15] It is the defendant's course of conduct, not the defendant's individual acts, that must engender the requisite fear in the victim. Moreover, in a stalking prosecution, the individual acts committed by the defendant are not necessarily criminal in themselves; rather, they become criminal because they are committed in series.

In prosecutions for this type of crime, courts have not required jury unanimity regarding the precise acts that the defendant committed. For example, in *Washington v. United States,* 760 A.2d 187 (D.C.App.2000), the defendant was charged with stalking his victim for over two years. On appeal, the defendant claimed that the trial judge committed plain error by not requiring the jury to reach unanimous agreement concerning the particular acts of contact that comprised his offense. The Court of Appeals for the District of Columbia rejected this argument because the *actus reus* of stalking is defined as a series of acts:

> Stalking ... is defined as a series of incidents that are part of a course of conduct extending over a period of time. As the government says in its brief, "it is the continuing course of conduct which constitutes the offense, not the individual discrete actions making up the course of conduct." ... [W]hen a single count is charged and the facts show a continuing course of conduct, rather than a succession of clearly detached incidents, a special unanimity instruction is unnecessary, absent some factor that differentiates the facts on legal grounds. No such factor is present here.

**11.** *Id.*

**12.** *Id.*

**13.** *Id.*

**14.** *Id.*

**15.** *See* AS 11.41.270(a)-(b)(1).

. . .

Although the [defendant's acts] occurred at different times, the statute specifically requires that the behavior be "on more than one occasion" and must occur "repeatedly." D.C.Code § 22–504(b). The charge set forth in the information encompassed a period of almost two and a half years, from August 1994 to January 1997. Thus we cannot say as a matter of law (as we must in order to find plain error) that the acts committed by appellant before the brief reconciliation were "separate criminal acts" from those committed after the reconciliation. Nor did [the defendant] present separate defenses to these acts; rather, he offered only a limited defense concerning the encounter at the school, and no defense as to anything else.

. . .

We hold that [the defendant's] behavior was a continuing course of conduct from the middle of 1994 until his arrest in January 1997, that it constituted a single offense . . ., and that he was therefore not entitled to a special unanimity instruction. . . .

*Id.* at 198–99 (citations omitted).

Similarly, in *State v. Johnson*, 243 Wis.2d 365, 627 N.W.2d 455 (2001), the defendant was convicted of engaging in "repeated [acts of] sexual assault [on] the same child", an offense requiring proof of at least three acts of sexual assault within a specified period of time.[16] The Wisconsin Supreme Court ruled that the jury was not required to reach unanimous agreement concerning the particular predicate acts that comprised the required three.[17]

Other courts have reached similar results when dealing with offenses that, although not necessarily defined as a series of acts, are often committed through a series of acts. For example, in *State v. Marko*, 107 Wash.

App. 215, 27 P.3d 228 (2001), the defendant was convicted of intimidating a witness by making several threats during the course of a 90–minute confrontation. The court held that "[j]ury unanimity [regarding the defendant's specific threatening utterances] is not required where the defendant's acts form a continuing course of criminal conduct".[18] Likewise, in *State v. Garman*, 100 Wash.App. 307, 984 P.2d 453 (1999), the Washington Court of Appeals held that a unanimity instruction is not required when a defendant is charged with one count of a higher degree of theft based on the aggregation of numerous small thefts committed pursuant to a common scheme, under a Washington statute similar to AS 11.46.980(c).[19] Finally, in *Commonwealth v. Lewis*, 48 Mass.App.Ct. 343, 720 N.E.2d 818 (1999), the court held that no unanimity instruction is required when the charged theft comprises successive takings motivated by a "single, continuing, criminal impulse or intent . . . pursuant to the execution of a general larcenous scheme".[20]

Returning to Cook's case, Cook alleges that Judge Savell committed plain error by failing to require the jury to reach unanimous agreement on Cook's individual acts of non-consensual contact, and whether each of those individual acts violated the terms of the protective order. But based on the cases we have just discussed, there was no obvious requirement of jury unanimity on these issues. To establish plain error, Cook must show that the purported error would have been obvious to any competent judge or attorney.[21] If reasonable judges could disagree as to whether error was committed, then the purported error is not "plain".[22] Cook has therefore failed to show plain error.

*4. Judge Savell did not commit plain error by failing to instruct the jury on potential lesser included offenses*

Cook argues that the jury should have been instructed on the lesser offense of

---

16. *See id.* at 457.

17. *See id.* at 460–64.

18. *Id.* at 231.

19. *See id.* at 458.

20. *Id.* at 826.

21. *See Massey v. State,* 771 P.2d 448, 453 (Alaska App.1989); *Carman v. State,* 658 P.2d 131, 137 (Alaska App.1983); *Marrone v. State,* 653 P.2d 672, 675–76 (Alaska App.1982).

22. *See Marrone v. State,* 653 P.2d 672, 676 (Alaska App.1982).

second-degree stalking defined in AS 11.41.270 (*i.e.*, stalking in which the acts of non-consensual contact do not violate a court order and do involve a victim younger than 16, and in which the defendant did not carry a deadly weapon).[23] He also argues that the jury should have been instructed on the lesser offense of violating a protective order, AS 11.56.740.

But Cook's attorney expressly told Judge Savell that Cook did not wish to have the jury instructed on any lesser offenses. We recently held that when the parties do not request jury instructions on lesser offenses, a trial judge does not commit plain error by failing to instruct the jury, *sua sponte*, on potential lesser included offenses. *See Heaps v. State*, 30 P.3d 109, 114–16 (Alaska App.2001). For these reasons, there was no error in Cook's case.

*5. Judge Savell did not violate Evidence Rule 404(b) when he allowed the State to introduce evidence of Cook's statements and actions in late 1998 and early 1999*

At Cook's trial, Judge Savell allowed the State to present the testimony of court clerk Brenda Mew concerning events that occurred in October 1998. Mew testified that she worked in the court's Domestic Violence Unit, and she remembered K.A.B. coming to her office to file a petition for a restraining order. Later, Cook came to her office. According to Mew, Cook "seemed distracted. He was very sweaty. He was kind of scattered ... [and his statements were] a little inappropriate and out of control."

Mew also testified that Cook telephoned her office on another occasion to ask whether K.A.B. had moved. She stated that Cook "was insistent on finding out whether or not [K.A.B.] had moved." A few days later, Mew mentioned this incident to K.A.B., who had in fact moved and had come to the clerk's office to notify the court of her change of address.

Finally, Mew testified that Cook filed a document on October 8, 1998, requesting a modification of the protective order so that he would be allowed to contact K.A.B. by telephone. Cook said that he was requesting this modification because he wanted "to get [past] this ... nightmare and hopefully someday reconcile with my best friend and love of my life".

On appeal, Cook argues that Mew's testimony was irrelevant and was prejudicial because it tended to portray Cook as "a little nuts". We disagree. One of the major elements of the State's case was proof that Cook was fixated on K.A.B.—that he knowingly and repeatedly engaged in contact with her after being alerted that she did not consent to this contact. Mew's testimony was relevant to show that Cook actively sought to maintain contact with K.A.B. despite the protective order. It also tended to show that Cook was upset by K.A.B.'s attempts to break off their relationship. Cook's state of mind at this time (early to mid-October 1998) was relevant to show his state of mind between October 27th and December 22nd, when Cook committed the acts of non-consensual contact with which he was charged.

Moreover, Mew's testimony did not create any appreciable danger of unfair prejudice. The statements and conduct that Mew testified about were not criminal or immoral in themselves. To the extent that these actions and utterances portrayed Cook in a bad light, this was because they were relevant to the charge of stalking.

Cook next claims that Judge Savell erred in allowing the State to present evidence of a letter that Cook wrote to K.A.B. from jail in February 1999. Cook argues that "[t]he only impact [of] this letter ... was to suggest to the jury that Mr. Cook had a propensity to engage in unwanted contact [with K.A.B.] by attempting to contact [K.A.B.], even from jail [where Cook was sent for his earlier violations of the protective order]." This is precisely why the letter was relevant and properly admitted. It tended to show Cook's continuing attitude toward K.A.B., his attitude toward the protective order, and his continuing perception of his relationship with K.A.B.—thus tending

---

**23.** Compare the basic definition of stalking, AS 11.41.270(a), with the list of aggravating factors contained in AS 11.41.260(a) that elevate the crime to first-degree stalking.

to prove Cook's state of mind from late October to late December 1998, when he committed the acts of non-consensual contact with which he was charged.

■ For much the same reasons, we uphold Judge Savell's decision to allow the State to introduce evidence of Cook's telephone call from jail in which he said, "This [is] war."

6. *Judge Savell did not commit reversible error when he directed the defense attorney to read aloud a clause of Cook's restraining order that was less favorable to Cook's position than another portion that the attorney had just read*

During the defense attorney's cross-examination of K.A.B., the defense attorney asked K.A.B. about one of the clauses of the six-month domestic violence protective order issued against Cook on October 27, 1998. The defense attorney directed K.A.B.'s attention to page 2 of the protective order, where Cook was ordered not to contact or communicate with K.A.B. "except . . . through an attorney or by U.S. mail". By directing the jury's attention to this exception for communications by mail, the defense attorney was trying to establish that Cook did not violate the protective order when he sent the letter to K.A.B. from jail on February 22nd.

(The indictment against Cook covered his actions during the period from October 27, 1998, through December 22, 1998. Thus, Cook's February 22nd letter to K.A.B. was not a component of the *actus reus* charged in the indictment. Instead, as explained above, Cook's act of sending this letter was relevant because it tended to show Cook's attitude toward the protective order and his perception of his relationship with K.A.B.—thus tending to prove Cook's state of mind during the earlier period covered by the indictment.)

Immediately after the defense attorney directed K.A.B.'s attention to the exception for communications by mail, Judge Savell ordered the defense attorney to read, "for purposes of clarity and wholeness", another clause found on the next page of the protective order. This second clause stated that Cook was not to "have any contact with

[K.A.B.] or her minor children". The defense attorney read this clause aloud, and then she asked K.A.B. about the two clauses. K.A.B. conceded that these two clauses were apparently contradictory, and she readily admitted that the protective order was "confusing" on this point.

A little later in the trial, Cook's attorney asked for a mistrial based on the judge's intervention during the cross-examination of K.A.B. The defense attorney asserted that when Judge Savell directed her to read the second clause of the protective order, the judge in effect "introduced [his] own evidence in favor of the State". Judge Savell denied the mistrial; he declared that when a witness is being questioned about the contents of a document, a trial judge has the discretion to apprise the jury of the totality of the document when "fairness calls [for it]".

Approximately two months later, after Cook had been found guilty, the defense filed a motion to disqualify Judge Savell from participating in Cook's sentencing (and any further proceedings in Cook's case). Like the earlier motion for mistrial, this motion for disqualification was based on Judge Savell's intervention during the defense attorney's cross-examination of K.A.B. Cook asserted that Judge Savell's action demonstrated that the judge could not be impartial, for he had "crossed the line from neutral arbiter to advocate". At the hearing on this motion, Judge Savell conceded that he had acted precipitously—that "in retrospect, . . . [his] decision was ill-advised". Nevertheless, he rejected Cook's contention that this action showed that he was biased in favor of the State.

On appeal, Cook again argues that Judge Savell's intervention in the cross-examination of K.A.B. required a mistrial. Cook asserts that Judge Savell's action effectively "communicated to the jury that the judge [thought] that Mr. Cook's attorney was not being fair in [her presentation of] evidence", and that it was therefore necessary for the judge "to step in and do the prosecutor's job [of] eliciting information . . . helpful to the state and harmful to Mr. Cook."

We agree with Cook that a trial judge must be careful to avoid taking actions that

the jury would reasonably construe as partisanship. Canon 2(A) of the Code of Judicial Conduct states that a judge must always "act in a manner that promotes public confidence in the integrity and impartiality of the judiciary". Moreover, Canon 3(E), requires judges to disqualify themselves whenever "[their] impartiality might reasonably be questioned" unless the ground of disqualification is affirmatively waived by all parties under the procedure set forth in Canon 3(F).

But these precepts do not prohibit a judge from taking a role in the presentation of evidence at trial. Indeed, Evidence Rule 614 explicitly recognizes trial judges' authority to "call witnesses on [their] own motion" and to "examine any witness" called by the parties.

The commentary to Rule 614 declares that "the court is not entirely a prisoner of the parties' approach to the case"; rather, "it is proper for the court to ask questions [of witnesses] in order to clear up confusion created by the parties".[24] Nevertheless, the commentary cautions that, in jury trials, a judge's questioning "should be ... guarded so as not to constitute an implied comment" on the merits of the case.[25]

Obviously, competing policies and values govern this aspect of the law. As the commentary to Rule 614(b) acknowledges, "the manner in which [judicial] interrogation should be conducted and the proper extent of its exercise are not susceptible of formulation in a rule".[26] The commentary suggests that when a trial judge's action is challenged, an appellate court must simply review the facts of the particular case and decide whether the judge's intervention constituted an abuse of discretion.[27]

Turning to the facts of Cook's case, we conclude that Judge Savell could properly take steps to apprise the jury of the second clause of the protective order (the clause that prohibited Cook from all contact with K.A.B. and her children). This clause was clearly relevant to the defense attorney's implication that Cook did not violate the protective order

when he sent K.A.B. a letter from jail on February 22nd.

Evidence Rule 106 states that when one party introduces a part of a writing, adverse parties "may require the introduction at that time of any other part [of the writing] which ought in fairness to be considered contemporaneously". The commentary to Rule 106 explains that, at common law, adverse parties always had the right to introduce the remaining relevant portions of the document, and that the crucial language in Rule 106 is the phrase "at that time":

> [When a substantial amount of] time elapses between the offer of part of a statement and the offer of the remainder, the jury may become confused or find it difficult to reassess [the] evidence that it ... heard earlier in light of [the] subsequent material. Rule 106 creates a right to require immediate admission of ... all relevant portions. It is designed to enable one party to correct immediately any misleading impression created by another party who offers part of a statement out of context.

Commentary to Alaska Evidence Rule 106, second paragraph.

We presume that Evidence Rule 614(b) authorizes a trial judge to invoke Rule 106, even though the judge is not an "adverse party". Nevertheless, one might argue that Judge Savell should not have stepped in so quickly—that he should have waited to see if the prosecutor would point out (or even feel the need to point out) the discrepancy between the two clauses of the protective order. Indeed, Judge Savell appears to have acknowledged the force of this argument when, three months later, he conceded that his action had been "ill-advised".

But even assuming that Judge Savell should have abstained from comment at that particular time, we do not believe that this isolated incident gave the jury the impression that Judge Savell sided with the State or that he believed that Cook's attorney was acting unethically. We note that Judge Savell made no further comment when, a few mo-

---

**24.** Commentary to Alaska Evidence Rule 614(a), second paragraph.

**25.** Commentary to Alaska Evidence Rule 614(b).

**26.** *Id.*

**27.** *See id.*

ments later, the defense attorney got K.A.B. to acknowledge that the protective order was "confusing" and that a person reading the order might not understand it to prohibit communication by letter.

Nor do we believe that Judge Savell prejudiced the fairness of the trial by directing the defense attorney to read the second clause to the witness, rather than reading this clause to the witness himself—as he would have been authorized to do under Evidence Rules 614(b) and 106. We acknowledge that Judge Savell's action created a potential procedural disadvantage for the defense: Had Judge Savell directed the question to K.A.B. himself, Evidence Rule 614 would have guaranteed the defense attorney the right to object to the judge's question and the right to cross-examine K.A.B. on the point raised by the judge.[28] For this reason, we do not endorse Judge Savell decision to make the defense attorney read the second clause. Nevertheless, there is no dispute that the protective order contained both clauses, and at that point, the entire document had already been admitted into evidence. After the defense attorney was directed to read the second clause of the order to K.A.B., the defense attorney was allowed to ask questions about this second clause that, in effect, constituted cross-examination on the point raised by Judge Savell. Moreover, as we noted above, the defense attorney got K.A.B. to admit that the two clauses of the order were contradictory and that the order was confusing.

For these reasons, we conclude (1) that Judge Savell did not abuse his discretion when he raised the issue of the second clause of the order, and (2) even if Judge Savell abused his discretion by requiring the defense attorney to point out the contradictory portion of the protective order rather than pointing it out himself, that error was harmless under these particular facts.

7. *Judge Savell's intervention in the defense attorney's cross-examination of K.A.B. did not demonstrate bias, nor did it create a reasonable appearance of bias*

 After Judge Savell denied Cook's motion for mistrial (discussed in the preced-

ing section), Cook asked the judge to recuse himself from the case. Cook argued that Judge Savell had, in effect, taken sides in the litigation and that, through his action, he had discredited both the defense attorney and the defense case in the eyes of the jury. Cook asserted that the judge's action demonstrated an actual bias against Cook or, alternatively, that the judge's action created a reasonable appearance of bias.

Judge Savell denied the motion for his disqualification. In accordance with AS 12.22.020(c), Judge Savell's decision was immediately reviewed by another judge—Superior Court Judge Ralph R. Beistline. Judge Beistline affirmed Judge Savell's decision.

On appeal, Cook renews his contention that Judge Savell's intervention during the cross-examination of K.A.B. either demonstrated true bias or created a reasonable appearance of bias. For the reasons discussed in the preceding section, we affirm Judge Beistline's decision that Judge Savell's action neither proved bias nor created a reasonable appearance of bias.

 In his brief, Cook asks us to broaden the scope of our inquiry by examining all of Judge Savell's actions in the case—before, during, and after trial. According to Cook, Judge Savell "engaged in a continuing course of conduct that demonstrated an apparent bias against Mr. Cook and/or his court-appointed attorneys[, beginning] at the first hearing at which Mr. Cook had any contact with Judge Savell". This argument was not preserved for appeal. In the trial court, Cook's motion for disqualification was based solely on Judge Savell's intervention during the cross-examination of K.A.B.

8. *Judge Savell did not conceal his issuance of an ex parte domestic violence restraining order against Cook*

In addition to the disqualification motion discussed in the preceding section, Cook filed a later motion to disqualify Judge Savell.

---

**28.** *See* Evidence Rule 614(a) and (c).

This second disqualification motion was based on events that occurred the preceding May, when Judge Savell was considering whether to accept the plea agreement described in section 1 of this opinion.

To briefly recapitulate, Cook and the State announced on April 2, 1999 that they had reached a plea bargain to resolve the case: Cook would plead no contest and would be sentenced to time served, with the remainder of a year suspended. Judge Savell accepted Cook's plea, but he reserved his final decision on the plea agreement until after he read the pre-sentence report. Seven weeks later, at a hearing on the afternoon of May 21st, Judge Savell told the parties that the proposed sentence was too lenient and he was therefore rejecting the plea agreement. Two weeks after that, Cook notified the court that he wished to withdraw his plea and go to trial. Cook's trial was held in early August.

On October 29, 1999 (*i.e.*, almost three months after the trial, and two weeks before Cook's scheduled sentencing), Cook filed his second motion to disqualify Judge Savell. This motion was based on the fact that, just prior to the hearing of May 21st at which Judge Savell rejected the proposed plea agreement, Judge Savell had granted K.A.B.'s petition for a new 20–day restraining order against Cook.

Cook argued that Judge Savell should have been disqualified from ruling on the proposed plea agreement (or, alternatively, certainly should not have rejected it) after the judge had granted an *ex parte* petition for a restraining order against Cook—a petition brought by the same woman who was the alleged victim in the pending stalking prosecution. Cook contended that Judge Savell's decision to issue the restraining order would cause reasonable people to conclude that he could not fairly evaluate the sentencing provisions of the proposed plea agreement. In the alternative, Cook argued that Judge Savell should not have ruled on the proposed plea agreement until he had at least notified the parties about his decision to grant the *ex parte* petition for a restraining order against Cook. Cook asserted that he and his attorney would reasonably have viewed the judge's issuance of the restraining order as a potentially disqualifying circumstance.

It is helpful to unravel the various strands of this argument. Cook's first claim is that Judge Savell should have had no further dealings with Cook's criminal case after the judge granted K.A.B.'s *ex parte* petition for a new restraining order against Cook.

Normally, Judicial Canon 3(B)(7) prohibits a judge from receiving *ex parte* communications about the merits of a case. (The term *"ex parte"* refers to a proceeding in which a judge hears from only one litigant or one allied group of litigants, while other litigants with adverse interests are not allowed to participate.[29]) The policy of this rule is obvious: no party should be able to take the decision-maker aside and privately influence them.

However, Judicial Canon 3(B)(7)(a) allows a judge to receive *ex parte* communications when the judge is "expressly authorized by law to do so". In situations involving domestic violence, AS 18.66.110(a) authorizes judges to hear *ex parte* applications for temporary restraining orders. Thus, it would appear that Judge Savell did not violate Canon 3(B)(7) when he heard K.A.B.'s *ex parte* petition for a 20–day restraining order.

Nevertheless, under the particular circumstances of Cook's case, Judge Savell ran a risk when he presided over the *ex parte* application for a restraining order. Cook was charged with stalking K.A.B. between October and December 1998, and Judge Savell was assigned to that criminal case. There was a possibility that, during the *ex parte* hearing, Judge Savell might hear things from K.A.B. or from some other witness that might influence his decision to accept or reject Cook's proposed plea agreement. Or, if for some reason the plea agreement fell apart and Cook went to trial, this same information might influence the judge's sentencing decision if Cook was convicted.

We faced an analogous problem in *Taylor v. State*, 977 P.2d 123 (Alaska App.1999). In

**29.** *See* Black's Law Dictionary (6th ed.1990), p. 576.

*Taylor,* the judge presiding over a bench trial was asked to hear a witness's *ex parte* explanation of why she was asserting the privilege against self-incrimination. The complication was that the witness was the defendant's wife, and it was at least conceivable that "when [she] explained how her proposed testimony might incriminate her, ... [she might admit] that she had engaged in criminal conduct jointly with Taylor." [30] Taylor argued that if the trial judge heard his wife's explanation *ex parte,* the judge "[might be] exposed to prejudicial information about Taylor ... [that would affect] the judge's deliberations when he rendered his verdicts at the end of Taylor's bench trials." [31]

In *Taylor,* we ultimately concluded that we did not have to resolve this problem because we examined the record of the *ex parte* hearing and found that the potential prejudice had not occurred: Taylor's wife's attorneys "gave only a vague description of her potential criminal liability; ... provided no details of her conduct, and ... made no assertions about Taylor." [32]

■ Cook's case is the same. In his written decision denying Cook's motion for disqualification, Judge Savell declared that he "had no contact with [K.A.B.]" and obtained no information from her when he heard and granted her *ex parte* petition for a restraining order. K.A.B.'s petition alleged simply that Cook had "assaulted and stalked" her. Judge Savell assumed that he could accept these assertions as true because six weeks before, in early April, Cook had pleaded no contest to the stalking charge.

In his brief to this court, Cook hints that we should not believe Judge Savell's statements on this point. But those statements are the only record we have. Presumably, Cook and his attorney had access to the pleadings that K.A.B. filed, and access to the recording of any hearing that occurred in connection with K.A.B.'s petition for the re-

straining order. Moreover, if Cook's attorney believed that the matter warranted an evidentiary hearing, she could have asked for one. Instead, Cook chose to leave Judge Savell's statements unchallenged.

■ This brings us to Cook's last argument. Cook asserts that even if Judge Savell was not exposed to any new evidence at the *ex parte* hearing, the judge still should have notified Cook and his attorney that he had issued the restraining order. Cook argues that the judge's decision to issue the restraining order was itself relevant because it tended to show that the judge could not impartially evaluate the proposed plea agreement. Thus, Cook asserts, Judge Savell was obliged to bring this matter to the attention of the parties before he proceeded to rule on the acceptability of the proposed plea agreement.

We do not see how Judge Savell's decision to issue the restraining order showed him to be incapable of fairly evaluating the proposed plea agreement. As just explained, Judge Savell was not exposed to any new information during the *ex parte* proceeding. He simply ruled that, given Cook's no contest plea to the stalking charge, K.A.B. was entitled to the new restraining order. Our supreme court has stated that "a judge may not be disqualified on the mere basis of previous rulings, opinions, or exercises of judicial discretion".[33] Cook has not suggested that K.A.B. was *not* entitled to the restraining order. Because Cook has provided no reason to believe that K.A.B. was not entitled to the order she sought, Cook has failed to convince us that Judge Savell's decision manifested anything other than a willingness to grant K.A.B. her legal due.

Moreover, the record does not support Cook's assertion that he and his attorney were ignorant of Judge Savell's action. In Judge Savell's written decision denying the motion for disqualification, the judge de-

30. *Id.* at 126.

31. *Id.*

32. *Id.*

33. *State v. City of Anchorage,* 513 P.2d 1104, 1112 & n. 22 (Alaska 1973). *See also Pride v.*

*Harris,* 882 P.2d 381, 385 (Alaska 1994) (the fact that a judge has come to negative conclusions about a defendant's character, based on prior experience in court, does not necessarily indicate that the judge is biased).

clared that Cook was served with a copy of the newly-issued restraining order shortly before Cook came to court for the hearing on the plea agreement. According to Judge Savell, Cook "had [the order] in his hand" and was "discuss[ing] it with his [attorney]" at the hearing. The restraining order plainly identifies "Richard D. Savell" as the judicial officer who issued it. Thus, Judge Savell concluded, there was no need to "[formally] disclose that such an order had been issued by [him]."

In his brief to this court, Cook argues that "[o]ther than Judge Savell's assertion, there is nothing in the record" to support the conclusion that Cook and his attorney were aware that Judge Savell had just issued the restraining order. Cook contends that Judge Savell engaged in mere "conjecture" when he stated that he observed Cook and his attorney discussing the restraining order in court. "[T]here is no objective basis," Cook asserts, "[for] Judge Savell's conjecture as to what Mr. Cook and his attorney might have been discussing or [might have been] looking at [while sitting at] counsel table across the courtroom from [the judge]."

But again, Judge Savell's statements are the only record we have. If Cook or his attorney believed that Judge Savell had misrepresented the facts or was mistaken in his observations, they could have sought reconsideration of the judge's decision under Criminal Rule 42(k). Instead, Cook again chose to leave Judge Savell's statements unchallenged.

Given this record, we uphold the superior court's conclusion that Cook and his attorney knew, before the plea agreement hearing began on the afternoon of May 21st, that Judge Savell had just issued a new restraining order against Cook. And because Judge Savell was aware that Cook and his attorney knew this, the judge's failure to formally announce this fact on the record is not a ground for questioning his impartiality.

In short, we uphold the superior court's denial of Cook's second motion to disqualify Judge Savell.

9. *Judge Savell did not commit plain error by failing to declare a mistrial sua sponte because of remarks made by the prosecutor during summation*

Cook argues that the prosecutor engaged in four types of improper argument during her summation to the jury: arguing facts not supported by the evidence, expressing a personal belief in the State's case, intentionally appealing to the jury's passions, and asking the jury to speculate on what further harm Cook might have inflicted if he had not been stopped. Cook did not object to the prosecutor's remarks at that time, so Cook must show that Judge Savell committed plain error by failing to step in and declare a mistrial even though none had been requested.

■ We have repeatedly declared that "trial judges must be extremely cautious about granting a mistrial when the defendant has not sought one." [34] The reason for this caution is that, "[u]nder the double jeopardy clause, if a judge declares a mistrial *sua sponte* when there is no necessity for it, the charges against the defendant must be dismissed." [35]

■ We have examined the record. Cook is simply wrong in asserting that the prosecutor mentioned facts not supported by the evidence. As to the other challenged remarks, they are perhaps susceptible of the interpretations urged by Cook if considered in isolation. But we must evaluate the prosecutor's summation as a whole.[36] After studying the summation as a whole, we conclude that any potential impropriety in the prosecutor's remarks was not the type of egregious and gravely prejudicial misconduct that would create a manifest necessity for declaring a mistrial without the defendant's consent. Accordingly, we conclude that Cook has not shown plain error.

**34.** *Riney v. State,* 935 P.2d 828, 838 (Alaska App.1997).

**35.** *Id.* at 838–39 (citing *Nelson v. State,* 874 P.2d 298, 308 (Alaska App.1994), and *March v. State,* 859 P.2d 714, 717 (Alaska App.1993)).

**36.** *See generally Darling v. State,* 520 P.2d 793, 794–95 (Alaska 1974); *Tuckfield v. State,* 805 P.2d 982, 987 (Alaska App.1991).

*10. Cook's sentence does not violate the Austin rule*

Cook's offense, first-degree stalking, is a class C felony punishable by up to 5 years' imprisonment.[37] Cook was a first felony offender. Under the sentencing rule that this court established in *Austin v. State*[38], a rule now codified in AS 12.55.125(k), Cook was entitled to receive a sentence more favorable than the 2–year presumptive term that would apply to a second felony offender convicted of the same offense—unless the State proved one or more aggravating factors under AS 12.55.155(c) or, alternatively, proved extraordinary circumstances under AS 12.55.165.[39]

Judge Savell sentenced Cook to 2 years, 8 months' imprisonment, but he suspended 16 months (*i.e.*, half) of this sentence. Thus, Cook received 16 months to serve.

■ In 1982, shortly after we decided *Austin*, we clarified that the *Austin* rule focuses primarily on a defendant's time to serve: when a defendant receives less time to serve than the presumptive term for a second felony offender, the defendant's sentence complies with *Austin* even though the defendant's total sentence (*i.e.*, with the addition of the suspended jail time) exceeds that presumptive term. *See Tazruk v. State*, 655 P.2d 788, 789 (Alaska App.1982). We have adhered to this interpretation of *Austin* for the past twenty years. Thus, under our current sentencing law, Cook's sentence does not violate *Austin:* Cook's sentence of 16 months to serve is more favorable than the 2 year presumptive term for second felony offenders.

Cook asks us to reconsider and reverse the *Tazruk* interpretation of the *Austin* rule. We are unpersuaded by his arguments. Moreover, as we mentioned above, the legislature has now codified the *Austin* rule and the *Tazruk* corollary in AS 12.55.125(k). This statute declares (with one exception that is not pertinent to the present discussion) that when a first felony offender is convicted of a felony that does not carry a presumptive term, the defendant

> may not be sentenced to a term of *unsuspended* imprisonment that exceeds the presumptive term for a second felony offender convicted of the same crime unless the court finds by clear and convincing evidence that an aggravating factor under AS 12.55.155(c) is present, or that circumstances exist that would warrant a referral to the three-judge panel under AS 12.55.165.

AS 12.55.125(k)(2) (emphasis added).

The whole point of our decision in *Austin* was to enforce the legislature's policy of reasonable sentence uniformity[40] in felony cases not governed by presumptive sentencing— *i.e.*, cases in which first felony offenders are sentenced for class B or class C felonies. Now the legislature has codified *Austin* and *Tazruk*, adopting them as the sentencing rule that governs these cases. Given the legislature's enactment of AS 12.55.125(k), we would not necessarily be free to alter the *Tazruk* rule even if we wished to do so— which we do not.

*11. Cook's challenges to the two sentencing aggravating factors found by Judge Savell are moot*

■ At Cook's sentencing, Judge Savell found two aggravating factors under AS 12.55.155(c). Cook argues that the judge erred in finding these two aggravators, both because the evidence did not support them and because the judge misconstrued the definitions of the aggravators.

However, the sole legal significance of these aggravators was that, having found them, Judge Savell was authorized to impose a sentence that exceeded the normal *Austin* ceiling. He did not exercise this authority. Thus, it makes no difference whether Judge Savell was correct or incorrect in finding the aggravators. Cook's arguments on this issue are moot.[41]

**37.** *See* AS 11.41.260(c) and AS 12.55.125(e).

**38.** 627 P.2d 657, 657–58 (Alaska App.1981).

**39.** *See Brezenoff v. State*, 658 P.2d 1359, 1362 (Alaska App.1983).

**40.** *See* AS 12.55.005.

**41.** *See Krack v. State*, 973 P.2d 100, 104 (Alaska App.1999); *Nagasiak v. State*, 890 P.2d 1134, 1135 (Alaska App.1995) (when a judge's authority to impose a particular sentence does not rest

*Conclusion*

The judgement of the superior court is AFFIRMED.