The STATE of Ohio, Appellee,

v.

WAYT, Appellant.

[Cite as *State v. Wayt* (1992), 83 Ohio App.3d 848.]

Court of Appeals of Ohio,
Butler County.

No. CA92–03–041.

Decided Nov. 23, 1992.

*John F. Holcomb*, Butler County Prosecuting Attorney, and *Daniel J. Gatter-meyer*, Assistant Prosecuting Attorney, for appellee.

*Fred Miller*, for appellant.

JONES, Presiding Judge.

Defendant-appellant, Lise C. Wayt, appeals her jury convictions for murder and child endangering in connection with the death of Marina Wayt, appellant's seven-month-old daughter.

In the early morning hours of May 14, 1991, police responded to appellant's Hunt Avenue residence in Hamilton following a call from appellant's neighbor. Upon entering, police found appellant's house in a state of disarray with garbage, various articles of clothing, dirty diapers and fecal waste strewn about the house. The dead child, dressed in a sleeper covered with fecal and urine stains, was found lying in a bassinet on a "warm and wet" pile of approximately one hundred pieces of clothing. The child's sleeper was also wet and there was froth coming from her mouth.

Appellant gave several accounts as to when she last fed the child, ranging from 8:30 p.m. until 10:10 p.m. when she put the baby to bed. Appellant claimed she found the child dead at approximately 1:30 a.m. on May 14. Appellant told Detective James Nugent that she was the only person who cared for the child during the past forty-eight hours, that her two-year-old son had taken the fecal material from his own diaper and spread it throughout the house, and that she simply had not had a chance to clean the house that day.

While at the scene, Robert Fant, the coroner's investigator, applied slight pressure to the baby's abdomen, causing fluid that appeared like "dirty water" to come out of the baby's mouth and nose. At the morgue, more of the same fluid was emitted from the child's mouth and nose when her body was removed from the bassinet and when the coroner applied pressure to the child's chest and abdomen. The child also suffered from a contusion on the back of her head that had been caused by either a blow with a blunt object or the exertion of pressure.

The child's diaper was full of fecal material, which the coroner described as too abundant an amount to have been released after death. The child also suffered from an extreme and painful case of diaper rash and had numerous open sores around her buttocks and vaginal area that could have been exacerbated by excessive moisture and fecal waste in her diaper. An autopsy revealed the baby had wet heavy lungs described as unusual for a child of her weight and length.

Dr. Richard Burkhardt, the county coroner, testified that the child's death was caused by drowning. Burkhardt based his opinion on the scene at appellant's residence, the froth around the baby's mouth, the fluid expelled from the baby's mouth and nose at both the scene and the morgue, the baby's wet heavy lungs, and the wet clothing found beneath the child in the bassinet. Dr. Norman Hurwitz, a pathologist with the coroner's office who performed the autopsy, testified that the cause of death was pneumonia resulting from an infection caused by the child's severe case of diaper rash. Dr. Hurwitz stated that he did not diagnose the death as drowning, since he had not viewed the scene where the drowning occurred and was not present at the morgue when the fluid was expelled from the child's mouth and nose.

The only defense witness, Dr. Marie Valdes–Dapena, a pediatric pathologist from Miami, Florida, testified that death resulted from neither drowning nor pneumonia. Dr. Valdes–Dapena categorized the child's death as a SIDS ("sudden infant death syndrome") death in the absence of any other medical explanation.

The state called one rebuttal witness, Dr. Robert Kirschner, a forensic pathologist and the Chief Medical Examiner for Cook County, Illinois, who testified that the cause of death was drowning. His opinion was based upon the froth emanating from the child's mouth, the fluid emitted from the child's mouth and nose, fluid found in the child's stomach during the autopsy, and the wet clothing found beneath the child in the bassinet.

Following trial in the Butler County Common Pleas Court, a jury found appellant guilty as charged. Appellant was sentenced to fifteen years to life for murder, with a consecutive one and one-half year sentence for child endangering. On appeal, appellant presents the following assignments of error for review:

Assignment of Error No. 1:

"The trial court erred to the prejudice of defendant-appellant when it refused to grant a mistrial after certain prejudicial remarks were made by a prospective juror."

Assignment of Error No. 2:

"The trial court erred to the prejudice of defendant-appellant when it refused to permit follow-up questions to a question posed by a juror."

Assignment of Error No. 3:

"The trial court erred to the prejudice of defendant-appellant when it admitted into evidence the notes of the chief detective."

Assignment of Error No. 4:

"The trial court erred to the prejudice of defendant-appellant when it admitted into evidence photographs of places where water could be stored inside the Wayt residence."

Assignment of Error No. 5:

"The cumulative error in this case necessitates [a] new trial."

■ In her first assignment of error, appellant claims the trial court erroneously denied her motion for a mistrial based upon a prospective alternate juror's remarks concerning Detective Nugent. During questioning of proposed alternative jurors, the following occurred:

"THE COURT: Mr. Giese, any reason why you feel you cannot sit as a fair and impartial juror?

"[JUROR] GIESE: No problem.

"THE COURT: And Ms. Olivas?

"[JUROR] OLIVAS: Other than the fact that I do know Detective Nugent. I worked with him for ten years at the Hamilton P.D.

"THE COURT: Do you feel that because of that relationship that you are involved in—law enforcement—would that make you favor one side or the other?

"[JUROR] OLIVAS: I would hope it wouldn't, but I do know for a fact that Mr. Nugent is a very thorough and—

"MR. SCHIAVONE: Objection, Your Honor.

"THE COURT: Sustained."

Appellant immediately moved for a mistrial and the trial court denied the motion. Appellant submits that the jury was tainted by Olivas' statements, thereby denying appellant her right to a fair and impartial jury.

In *State v. McCoy* (Aug. 3, 1992), Butler App. No. CA91–07–126, unreported, at 8–9, 1992 WL 185684, this court held that the trial court did not abuse its discretion in refusing to grant a mistrial as a result of a juror's comment that he knew the defendant because the defendant was involved in a fight at the juror's business establishment. The trial court is granted broad discretion incident to the impaneling of a jury, and a clear abuse of that discretion must occur to warrant a reversal. *Id.*

In the case at bar, the juror was peremptorily stopped and excused for cause, her remarks were not solicited by the state, and the court instructed the jury to ignore the remarks. Most important, however, Detective Nugent, did not, and could not, testify as to the crucial issue herein, the actual cause of death. In addition, the juror's statements did not amount to an expression that appellant was guilty of the crimes with which she was charged. *Id.* at 9.

The granting or denial of a mistrial rests within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 382, 510 N.E.2d 343, 349. The trial court took appropriate corrective measures and its refusal to grant appellant's motion for a mistrial does not constitute an abuse of discretion. For the reasons stated above, appellant's first assignment of error is overruled.

In her second assignment of error, appellant claims the trial court erred by denying appellant the opportunity to ask follow-up questions to a juror's question. Prior to the beginning of trial, the trial court indicated, over appellant's objection, that it would permit the jury to question witnesses. The trial court considered such innovation to be the "wave of the future" and necessary to ensure a fair trial to both parties. According to the court's ground rules for this procedure, the jurors would be permitted to ask questions after counsel had completed their examination of a witness. All jury questions were to be submitted in writing to the trial court, who would then pose the question to the witness. The court would phrase the question in a proper form and, if a particular question was improper, would disallow it and accordingly inform the jury. Finally, the court indicated that counsel would have the opportunity to ask follow-up questions to those posed by the jury.

Although several jury questions were posed to witnesses during appellant's trial, the focus of this assignment of error is a jury question presented to Detective Nugent. As the state's investigating officer, Nugent described the scene at appellant's residence and the child's condition. Nugent also attended the autopsy and described the fluid discharged from the child's mouth and nose when pressure was applied to her abdomen and chest. In addition, Nugent questioned appellant and was responsible for the collection and custody of much of the state's physical evidence, including both the child's clothing and the clothing in the bassinet.

On cross-examination, Nugent testified that the clothes were allowed to dry before they were sent to the Bureau of Criminal Investigation for analysis. Nugent stated that he did not attempt to extract and retain a sample of the liquid from the clothes before allowing them to dry. In addition, no sample of the liquid emitted from the baby's mouth and nose was retained or saved. Nugent also

testified that when the autopsy was performed, the baby's stomach contents were retained to the extent possible.

At the conclusion of Nugent's testimony, the following occurred as a result of a question from the jury:

"COURT: Now we have a question by the jurors, 'Was a lab report made on the liquid content?'

"WITNESS: Contents—

"COURT: On the clothes.

"WITNESS: On the clothes, no. The clothing was sent to the laboratory and there was a report returned.

"COURT: All right.

"SCHIAVONE [Defense Counsel]: Just ask that the witness answer the question, Judge. It calls for a yes or a no.

"COURT: Well, he—I'm going to allow it.

"GATTERMEYER [Prosecutor]: I object to that, Judge. I don't think—

"COURT: Gentlemen.

"GATTERMEYER:—this is a cross-examination.

"COURT: Everybody stop, everybody stop. I've allowed the question and I've allowed the answer. Now, if counsel has any further questions, you may ask them now, as long as they're not repetitious as to the other questions. Go ahead. The prosecution first.

"GATTERMEYER: As to the question that was asked?

"COURT: Any follow-up questions?

"GATTERMEYER: No. Your Honor.

"COURT: Mr. Schiavone?

"FURTHER RECROSS-EXAMINATION BY MR. SCHIAVONE:

"Q. Detective, just so that I understand your answer, the question was, 'Was the liquid * * *.'

"SCHIAVONE: May I, Your Honor? I just want to see the exact question again.

"COURT: Well, I changed the question.

"SCHIAVONE: Would you ask the question again so that I—

"COURT: I asked him whether their lab report was made on the liquid content, and he hesitated and I said, 'On the clothes.' And then he answered that question.

"Q. And your answer was as to the liquid?

"A. It was sent—The clothing was sent to BCI and the test was performed and the results were sent back.

"Q. All right, Officer, I'd like for you to answer the question that the Judge asked.

"A. That's the way I answered it.

"Q. No, you talked about clothing. The question is in regards to the liquid, the liquid content. Was that tested, the liquid?

"A. Only what remained in the dried clothes. You're getting into scientific parts there. I don't know if there was anything that can be retained out of them clothings [sic] from the liquid.

"Q. Thank you.

"COURT: Anything further?

"(No audible response.)

"COURT: You may—

"UNIDENTIFIED JUROR: Can I ask a different question and word it different—

"COURT: Yes.

"UNIDENTIFIED JUROR:—'cause he still didn't answer what I was—

"COURT: 'Was a lab report done on the dried clothes to determine what caused the wetness?'

"WITNESS: The clothes were sent to the laboratory in a dried state. They would have to explain how they tested those clothes.

"COURT: All right. So you're unable to answer that question?

"WITNESS: No, I'm not. They did test them and send the results back.

"COURT: All right. And were the solids remaining tested?

"WITNESS: The remaining from the baby's stomach, I contacted numerous laboratories from California, I contacted the FBI in Washington, D.C., approximately eight or nine laboratories throughout the country, and all of them—

"SCHIAVONE: Objection.

"WITNESS:—gave the same answers.

"SCHIAVONE: Objection.

"COURT: Yes. You cannot give what they said, but you did contact laboratories. And, as a result of your contact, did you send them?

"WITNESS: No. They couldn't test it.

"COURT: Anything further?

"FURTHER RECROSS–EXAMINATION BY MR. SCHIAVONE:

"Q. They couldn't test them, Officer, because they were dry; right?

"A. He's referring to the contents of the stomach.

"Q. That's what I'm referring to.

"COURT: No, Mr. Schiavone, the question goes to the—

"SCHIAVONE: To the liquid.

"COURT: To the solids.

"SCHIAVONE: The clothing, right, Judge, if I followed the question? I'm sorry, maybe I didn't follow the question.

"GATTERMEYER: Can we approach the bench, please, Judge?

"COURT: Yes.

"SCHIAVONE: It's a little complicated, Judge. I'm sorry.

"COURT: No, it's—No comments, please.

"(Thereupon, the following transpired at the bench, out of the hearing of the jury):

"GATTERMEYER: Judge, I don't want to see any kind of contact or clarification between the defense lawyer and the jury. None has happened, but I just want to say no contact like that. I really think that you've—

"SCHIAVONE: (Inaudible.)

"SCHIAVONE: I said none has happened. But I don't want anyone saying what did the juror mean and then the juror maybe mistaken in thinking they're allowed to ask an oral question. And I also would ask the Court to please— You've asked the question that the juror asked, the answer was made—

"COURT: I'm going to—I think the questions have been answered sufficiently. This officer cannot answer. It's a lab report, that's clear, and all counsel is doing is just asking more and more questions. So the questions are going to stop. This witness is excused.

"SCHIAVONE: I just need to make a record here. This is what we're running into. Now a door has been opened regarding the testing of that liquid and now we're just going to let it drop.

"COURT: No. You've already explored it.

"SCHIAVONE: But he hasn't answered the question.

"COURT: Yes, he has.

"SCHIAVONE: He answered it by saying—

"COURT: His answer is sufficient."

It is appellant's position that this line of questioning was prejudicial, since the crucial issue in the case at bar was the cause of death. The state's murder charge was predicated upon the allegation that appellant intentionally drowned her daughter. Several witnesses described the liquid emitted from the child's mouth and nose as appearing like "dirty water" and having the consistency of water. Curiously, however, neither Nugent nor the coroner's staff caused an analysis to be conducted on the liquid. In fact, no means were taken to even retain a sample, although the authorities suspected a possible drowning.

The juror's initial question, as reformulated by the trial court, was whether a lab report had been made on the liquid contents. When Nugent hesitated, the court added "on the clothes." After the witness responded, counsel was permitted to ask additional questions as provided in the court's ground rules. The juror, apparently unsatisfied with Nugent's answer, was then permitted to reword the question. After Nugent responded, the court then asked its own question pertaining to the child's stomach contents. Once Nugent responded, the court prohibited counsel from asking follow-up questions.

■■ "The right of a juror to ask questions of a witness during trial is clearly within the sound discretion of the trial court * * *." *State v. Sheppard* (1955), 100 Ohio App. 345, 390, 60 O.O. 298, 322, 128 N.E.2d 471, 499, affirmed (1956), 165 Ohio St. 293, 59 O.O. 398, 135 N.E.2d 340, certiorari denied (1956), 352 U.S. 910, 77 S.Ct. 118, 1 L.Ed.2d 119. The practice is generally not encouraged, since jurors are not familiar with the rules governing the admission of evidence and the practice is dangerous to the rights of the litigants. *Id.* The practice has received mixed reviews and has been both endorsed and criticized in other jurisdictions. See *State v. Sexton* (Nov. 24, 1982), Clark App. No. 1689, unreported, at 5, 1982 WL 3868. See, also, Annotation, Propriety of Jurors Asking Questions in Open Court During Course of Trial (1970), 31 A.L.R.3d 872. We find that the trial court's decision to allow the jury to ask questions, standing alone, was neither prejudicial nor an abuse of discretion. *Sheppard, supra.* However, while the practice itself may be acceptable, its use may constitute reversible error if implemented in a manner that prejudicially and substantially affects the complainant's rights. See Annotation, *supra*, at 882–883.

As the *Sexton* court observed, " * * * in order to justify interference by the appellate court there must be some affirmative showing that the improper questioning did actually operate to the complaining party's detriment." *Sexton, supra,* at 7. Inasmuch as the state contends that appellant deliberately drowned her daughter, an analysis of the baby's stomach contents could have been crucial, especially since the state's witnesses could not agree on the cause of death. While the court did not abuse its discretion in allowing jury questions, we find that the court abused its discretion by deviating from its ground rules when it denied appellant's counsel the opportunity to ask follow-up questions on the matter raised by the court's own question. For these reasons, appellant's second assignment of error is well taken and hereby sustained.

Appellant's third assignment of error claims that the trial court erred in admitting Detective Nugent's notes into evidence. While testifying, Nugent related statements made to him when he questioned appellant about the baby's death. On cross-examination, counsel asked Nugent if he made any notes regarding appellant's statements. Nugent admitted that he made notes, that he reviewed those notes prior to his testimony, and that he left the notes at police headquarters. The trial court ordered Nugent to produce his notes and make them available to appellant. Then, over appellant's objection, the court granted the state's motion to introduce the notes into evidence.

■ Evid.R. 612 provides that where the recollection of a witness is refreshed through the use of a document, the document is to be made available to adverse counsel. The rule requires production to adverse counsel when the document is actually used during testimony at trial in an effort to refresh the witness' recollection. *State v. Byrd* (1987), 35 Ohio App.3d 100, 519 N.E.2d 852. However, where the document is used to refresh recollection before testifying, the document is subject to production in the discretion of the trial judge. *Id.*

■ The trial court exercised its discretion and ordered the notes produced for appellant's counsel. The trial court then determined that appellant, by raising the issue of the notes, had given the inference that Nugent was "hiding something." The court permitted the notes' introduction into evidence under Evid.R. 801(D)(1)(b) as a prior consistent statement offered to rebut appellant's charge of fabrication or improper motive.

Counsel was not attempting to establish that Nugent had an improper motive for leaving the notes at headquarters. Counsel was simply trying to lay the necessary foundation for requesting production of the notes under Evid.R. 612 by establishing that Nugent had used the notes to refresh his recollection. By inquiring whether Nugent had used the notes during his testimony or reviewed them prior to testimony, counsel was attempting to ascertain whether production

of the notes was mandatory or subject to the court's discretion. The court's subsequent erroneous admission of the notes not only impermissibly bolstered Nugent's credibility, but also violated Evid.R. 803(5), which permits the contents of the document itself to be read into evidence only when it fails to refresh the witness' independent recollection. See *State v. Scott* (1972), 31 Ohio St.2d 1, 60 O.O.2d 1, 285 N.E.2d 344.

We therefore find that it was error to admit the notes themselves into evidence. Accordingly, the third assignment of error is well taken and hereby sustained.

In her fourth assignment of error, appellant claims the trial court erred in admitting certain photographs into evidence. The photographs depicted a wash basin, bathroom sink, kitchen sink, toilet, bathtub, a tub drain, and the bathroom sink drain. The photographs were taken two months after the alleged homicide and were offered for the purpose of showing that appellant had the opportunity to drown the child.

The elements of a crime must be gathered wholly from the statute. *State v. Warner* (1990), 55 Ohio St.3d 31, 52, 564 N.E.2d 18, 38, certiorari denied (1991), 499 U.S. ——, 111 S.Ct. 1584, 113 L.Ed.2d 649. As defined by R.C. 2903.02, "murder" is " * * * purposely caus[ing] the death of another." The statute does not include opportunity as an element and the state is not required to prove opportunity to obtain a conviction. The state offered no proof as to how or where the drowning occurred, only that the child died as a result of a purposeful drowning by appellant.

"Relevant evidence" is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. Tolliver* (1984), 16 Ohio App.3d 120, 16 OBR 126, 474 N.E.2d 642; Evid.R. 401. Evidence which is deemed not relevant is inadmissible. Evid.R. 402.

Opportunity is of no consequence to the determination of whether appellant committed the charged crime. We therefore conclude that the photographs in question were not relevant to the issue of whether appellant murdered her daughter. Consequently, the admission of the photographs was erroneous and the fourth assignment of error is sustained.

In her fifth and final assignment of error, appellant contends that cumulative errors require a new trial. Having found appellant's second, third and fourth assignments to be prejudicial error, it is unnecessary to find that these errors amounted to cumulative error. *Washington Court House v. Moore* (Nov. 13, 1989), Fayette App. No. CA89–03–005, unreported, at 8–9, 1989 WL 135811. The fifth assignment of error is hereby overruled.

Appellant's convictions are hereby reversed and the cause is remanded for a new trial.

*Judgment reversed*
*and cause remanded.*

KOEHLER, J., concurs.

WILLIAM W. YOUNG, J., dissents.

WILLIAM W. YOUNG, Judge, dissenting.

The trial court did not abuse its discretion when it limited appellant's counsel's further cross-examination of Detective Nugent. In answer to all of the questions posed to him concerning the results of any tests on the liquid, Nugent stated that he simply did not know if there was anything that could be retained from the liquid. No doubt the questioning got out of hand, but the answer was given and appellant was not prejudiced.

As to Nugent's notes, the admission or exclusion of evidence is within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343. The officer testified, was subject to cross-examination, and the notes were consistent with his testimony. This negated the implication that Nugent was "hiding something." The court did not abuse its discretion in admitting the notes.

As to appellant's fourth assignment of error concerning the photographs, their admission into evidence was not an abuse of discretion. The photos depict what the state alleges are possible locations of water which would constitute the "crime scene" under the state's theory.

In summary, all of the rulings on admission of evidence were within the sound discretion of the trial court. The rulings made did not constitute abuse of that discretion.

I would affirm the judgment below and thus dissent.