**Alya S. LANDT, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–8154.**

Court of Appeals of Alaska.

March 19, 2004.

---

25. *In re S.H.,* 987 P.2d at 741.

26. *See H.C.S. v. Cmty. Advocacy Project of Alaska, Inc.,* 42 P.3d 1093, 1096 (Alaska 2002).

Margi A. Mock, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

At the beginning of Alya S. Landt's trial, Superior Court Judge Fred Torrisi informed the jury that each member could propose questions for the witnesses. During the trial, Judge Torrisi put several of the jurors' proposed questions to various witnesses after he and the parties had reviewed those questions. Landt now appeals, arguing that the superior court erred by allowing the members of the jury to propose questions. We conclude that Judge Torrisi did not abuse his discretion. In the context of the case, we also conclude that even if Judge Torrisi erred, the error was harmless. Therefore, we affirm Landt's convictions.

### Background facts and proceedings

In the early morning of September 3, 2000, Unalaska Police Officer Aaron Renken contacted Landt, Ty Dushkin, and Robert Shapsnikoff because he saw the trio arguing outside a bar. Landt told Officer Renken that they were arguing because Shapsnikoff had taken her keys and he would not return them. Shapsnikoff said he took the keys

because he believed that Landt was too intoxicated to drive.

Officer Renken also thought Landt was too intoxicated to drive, but since Landt said she needed her keys because her house key was on the key ring, Officer Renken told Shapsnikoff to return her keys. Officer Renken warned Landt that if he saw her driving, he would arrest her for driving while intoxicated. Dushkin pulled Landt away and said that he would not let Landt drive and would see that she got home.

About one and a half hours later, Landt telephoned Kent Steele, a physician's assistant whom she worked with, and asked him to come to the new HUD housing to care for a man [Shapsnikoff] whom she had found in the road. Landt told Steele that the man, who she thought had been hit by a car, was unconscious and not breathing. Steele immediately called 911. Despite emergency treatment, Shapsnikoff was pronounced dead at the scene.

Officer Renken and Officer Lowell Creeze spoke with Landt and Dushkin at the scene when the officers responded to the 911 call. Dushkin told officers that he and Landt had found Shapsnikoff lying in an intersection nearby, and that Dushkin had helped Shapsnikoff almost to his house, where Shapsnikoff collapsed in the street. Landt said that she and Dushkin had been driving home when they found Shapsnikoff lying in the street, and that they had placed him in the truck and driven him home. Landt also explained that she and Dushkin had phoned for help when they realized that Shapsnikoff was not breathing. At trial, Officer Creeze testified that he understood Landt to have said that she, rather than Dushkin, had been driving the truck when they found Shapsnikoff.

Shapsnikoff died as a result of multiple blunt force injuries, consistent with being run over by an automobile. The police discovered rub marks and cloth fibers consistent with Shapsnikoff's clothing on the undercarriage of Landt's truck.

At this point, police interviewed Dushkin again. Consistent with this interview, Dush-kin testified at trial that Landt was driving when she suddenly saw someone lying in the roadway and accidentally ran over the person. Landt stopped the car, and Dushkin ran back to the person [Shapsnikoff]. They put Shapsnikoff in the truck, and Landt drove to Shapsnikoff's house. When Landt and Dushkin realized that Shapsnikoff was probably dead, they phoned for help.

The grand jury indicted Landt on manslaughter, criminally negligent homicide, and tampering with evidence.[1] The State also charged Landt with driving while intoxicated.[2]

Before opening statements, Judge Torrisi told the attorneys that he would let the jurors propose questions for the witnesses. Landt objected, arguing that the procedure would allow jurors to aid the State in meeting its burden of proof. The judge overruled the objection, stating that he had allowed questioning in previous trials, that the practice helps jurors to understand the evidence better, and that he thought there was nothing unconstitutional about the practice.

After opening statements, Judge Torrisi gave the jury preliminary instructions. At this point, Judge Torrisi told the jurors that he would allow them to question witnesses:

> I am going to allow—if there are questions that you feel are not answered by a witness, I'm going to allow you to ask questions. Now, the lawyers here are familiar with this case. .... They also know the Rules of Evidence. They know certain things can come in, certain things can't come in. And so they are going to probably ask pretty much everything that's— that the witness knows. They know what the witness knows more than we do because most of these witnesses have been interviewed. So there's probably not much that you would need to ask about. On the other hand, you're the one that's going to have to decide it in the end. So if at the end of a witness' testimony you still have questions, then you can write down the question and pass it forward. . . . .

---

**1.** AS 11.41.120(a)(1), AS 11.41.130(a), and AS 11.56.610(a)(1), respectively.

**2.** AS 28.35.030.

I would sort of like somebody up front here to be the note taker—collector. I don't want anybody reading anybody else's [questions]. The way it's going to work is if you do pass it forward, I will try to remember before I excuse a witness, and maybe whoever's the note collector can remind me if I forget. But I promise to look at every question. I don't promise to ask any of them. The way it works is I'll bring the lawyers up. They can look at it. If it's something that didn't get asked, if it's a proper question, I'll ask it for you, and then they'll get a chance to follow up if they want to do that. But I may not get a chance—I mean it may be that there's no questions. It may be there's lots. It may be that I won't get a chance to tell you why I didn't ask something. But I'll just tell you if you want to do it, you've got the paper. When you think of it, you might want to write it down, and then if it still hasn't been asked when the thing's over, you might want to shoot it forward and we'll take it from there.

Whenever a juror proposed a question, Judge Torrisi and the parties discussed it outside the hearing of the jury. If Judge Torrisi asked the proposed question (or a modification of the question), he permitted the attorneys to ask follow up questions.

Jurors proposed fifty-two individual questions, forty-two of which the judge asked after discussing the questions with counsel outside the hearing of the jury. Many of the questions sought to clarify details about where and when pieces of evidence were found; some questions sought more detailed information than the police officers had gathered.

Jurors proposed three questions for Landt, one of which Judge Torrisi asked. Judge Torrisi rejected two questions because of objections by the defense—"[w]hy didn't you tell the police officers that you believed Ty [Dushkin] had hit Bobby [Shapsnikoff]?" and "[w]hy did you consult with an attorney so soon after the accident?" The court did ask the third question, in which a juror sought to clarify by what name Landt was referring to Officer Creeze. (Landt was referring to Creeze by his first name, Lowell).

The jury convicted Landt of tampering with evidence and driving while intoxicated and acquitted her of manslaughter and criminally negligent homicide.

*Did the superior court deprive Landt of a fair trial by allowing jurors to propose questions for the witnesses?*

■ Landt argues that the superior court's decision to allow jurors to propose questions for the witnesses violated her rights to a fair trial and to an impartial jury under the federal and state constitutions. Landt argues that juror questioning requires jurors to form opinions about the case before the parties have presented all the evidence, because jurors must hypothesize about what happened in order to form a question.

Recently, in *State v. Culkin*,[3] the Hawaii Supreme Court upheld a pilot program that allows jurors to question witnesses against challenges similar to the ones Landt raises in this appeal. The court noted that several federal circuit courts that have considered the issue have decided that the trial court has the discretion to permit juror questioning.[4] Although no federal circuit has declared juror questioning illegal, several have discouraged juror questioning.[5] The majori-

---

3.  97 Hawai●Fi 206, 35 P.3d 233 (2001).

4.  *Id.* at 252, citing *United States v. Feinberg*, 89 F.3d 333, 336 (7th Cir.1996); *United States v. Sutton*, 970 F.2d 1001, 1004–07 (1st Cir.1992); *United States v. Lewin*, 900 F.2d 145, 147 (8th Cir.1990); *DeBenedetto v. Goodyear Tire and Rubber Co.*, 754 F.2d 512, 516 (4th Cir.1985); *United States v. Callahan*, 588 F.2d 1078, 1086 (5th Cir.1979); *United States v. Gonzales*, 424 F.2d 1055, 1056 (9th Cir.1970); *United States v. Witt*, 215 F.2d 580, 584 (2nd Cir.1954).

5.  *See Feinberg*, 89 F.3d at 336 ("We agree that the practice [of juror questioning of witnesses] is acceptable in some cases, but do not condone it."); *United States v. Ajmal*, 67 F.3d 12, 14 (2nd Cir.1995) (holding that trial courts abuse their discretion if they allow juror questioning of witnesses in the absence of "extraordinary or compelling circumstances", and without first balancing the potential benefits and disadvantages of the practice); *United States v. Bush*, 47 F.3d 511, 515 (2nd Cir.1995) ("Although we reaffirm ... that juror questioning of witnesses lies within the

ty of state courts that have considered the issue have upheld the process as within the discretion of the trial court,[6] although some states have rejected the practice.[7]

The *Culkin* court noted that even under the traditional adversary system, the parties and their attorneys are not in sole control of the presentation of evidence. The trial judge, too, has traditionally exercised the power to question witnesses and even to call witnesses that the parties have neglected or refused to call.[8] Questions proposed by jurors resemble questioning by a judge, who, under our adversarial system, retains the power to question, or summon witnesses.[9]

Obviously, a judge must be impartial, but the power to question or summon witnesses is not necessarily inconsistent with impartiality. In *Cook v. State*,[10] we ruled that a trial judge can present evidence at trial under Alaska Rule of Evidence 614, as long as the judge does so impartially.[11]

> [A] trial judge must be careful to avoid taking actions that the jury would reasonably construe as partisanship.... But [this does] not prohibit a judge from taking a role in the presentation of evidence at trial. Indeed, Evidence Rule 614 explicitly recognizes trial judges' authority to "call witnesses on [their] own motion" and to "examine any witness" called by the parties. The commentary to Rule 614 declares that "the court is not entirely a prisoner of the

parties' approach to the case"; rather, "it is proper for the court to ask questions [of witnesses] in order to clear up confusion created by the parties"[, although] a judge's questioning "should be ... guarded so as not to constitute an implied comment" on the merits of the case.[12]

Using analogous reasoning, the Hawaii Supreme Court in *Culkin* rejected the assertion that giving jurors the power to question witnesses was inconsistent with the adversary system of justice. The court quoted the words of the Court of Appeals for the District of Columbia in *Yeager v. Greene:*

> Questions by jurors ... may bring to the court's and counsel's attention improper concerns which can be promptly addressed with cautionary instructions, admonishing the juror who asked the question that the matter is not relevant to the case and should not be brought to the attention of other jurors or play any part in the inquiring juror's consideration of the case. Additionally ... it seems indisputable that the increased effectiveness of communication with jurors that will result if they are permitted to pose questions to witnesses will aid in finding the truth. As one of the most recent and thorough commentaries on the questioning of witnesses by jurors observed:

trial judge's discretion, we strongly discourage its use.").

6. See *Culkin*, 35 P.3d at 253; *State v. LeMaster*, 137 Ariz. 159, 669 P.2d 592, 596–97 (App.1983); *Nelson v. State*, 257 Ark. 1, 513 S.W.2d 496, 498 (1974); *People v. McAlister*, 167 Cal.App.3d 633, 213 Cal.Rptr. 271, 276–77 (1985); *Gurliacci v. Mayer*, 218 Conn. 531, 590 A.2d 914, 930 (1991); *Scheel v. State*, 350 So.2d 1120, 1121 (Fla.App. 1977); *Rudolph v. Iowa Methodist Medical Center*, 293 N.W.2d 550, 556 (Iowa 1980); *Transit Auth. of River City v. Montgomery*, 836 S.W.2d 413, 416 (Ky.1992); *Commonwealth v. Urena*, 417 Mass. 692, 632 N.E.2d 1200, 1206 (1994); *People v. Heard*, 388 Mich. 182, 200 N.W.2d 73, 76 (1972); *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 867 (Mo.1993); *Sparks v. Daniels*, 343 S.W.2d 661, 667–68 (Mo.App.1961); *State v. Graves*, 274 Mont. 264, 907 P.2d 963, 966–67 (1995); *State v. Jumpp*, 261 N.J.Super. 514, 619 A.2d 602, 610–12 (App.1993); *People v. Bacic*, 202 A.D.2d 234, 608 N.Y.S.2d 452, 452 (1994); *State v. Howard*, 320 N.C. 718, 360

S.E.2d 790, 795 (1987); *State v. Wayt*, 83 Ohio App.3d 848, 615 N.E.2d 1107, 1112 (1992); *Krause v. State*, 75 Okla.Crim. 381, 132 P.2d 179, 182 (App.1942); *State v. Munoz*, 67 Wash.App. 533, 837 P.2d 636, 639 (1992).

7. See *State v. Costello*, 646 N.W.2d 204, 214 (Minn.2002); *Wharton v. State*, 734 So.2d 985, 990 (Miss.1998); *Morrison v. State*, 845 S.W.2d 882, 888 (Tex.Crim.App.1992); *State v. Zima*, 237 Neb. 952, 468 N.W.2d 377, 380 (1991); *Matchett v. State*, 257 Ga. 785, 364 S.E.2d 565, 566–67 (1988).

8. See *Culkin*, 35 P.3d at 254.

9. *Id.* at 252–53.

10. 36 P.3d 710 (Alaska App.2001).

11. *Id.* at 724–25.

12. *Id.* (footnote omitted).

Only when evidence and issues are communicated successfully to jurors can they begin to fulfill their duty to seek truth and deliver a just verdict. But, because the jury is relegated to a passive role, communication in a trial is basically a one-way system—a system notably lacking in ability to insure a reliable communication of evidence or issues to the jury.

Allowing jurors to ask questions of witnesses would promote better and more reliable communication, because a two-way system provides for constant clarification of messages being sent. Understanding testimony more clearly, jurors thus would be able to fulfill their basic function of finding the facts in dispute.

Finally, there is reason to believe that permitting receivers of information, *e.g.*, jurors, to ask questions enhances not only their ability to understand what is being communicated, but results in their putting forth more effort to listen and to understand because they know they may ask questions. A concomitant benefit predictable from these effects might well be a reduced likelihood that the court will be required to intervene to question witnesses or elucidate issues that are clarified by juror questions.[13]

Landt argues that juror questioning does not compare with questioning by the trial judge because the judge is trained in the law and is required to see that justice is done, while the jury is not legally trained and is instructed to sit as a neutral factfinding body. She relies on *DeBenedetto v. Goodyear Tire & Rubber Co.*[14] for this argument.[15] But the juror questioning process in *DeBenedetto,* unlike that in Landt's trial, did not prevent the jury from hearing the questioning juror's question, which was spoken aloud by the juror before the trial judge ruled on its propriety.[16] In Landt's trial, jurors proposed questions in writing, and Judge Torrisi and both attorneys reviewed the questions.

The attorneys were able to object to questions outside of the hearing of the jury. Therefore, we conclude that allowing jurors to propose questions in Landt's trial did not undermine jurors' impartiality.

In *Commonwealth v. Britto,*[17] the Massachusetts Supreme Judicial Court recently upheld the constitutionality of jurors' questioning witnesses at criminal trials under a procedure similar to the one employed by Judge Torissi in this case. The court listed several concerns that a trial judge permitting juror questions should consider:

(1) "[T]he judge should instruct [the jury] ... that they will be given the opportunity to pose questions to witnesses." We suggest that the jury also be instructed not to let themselves become aligned with any party, and that their questions should not be directed at helping or responding to any party. Rather, they must remain neutral and impartial, and not assume the role of investigator or of advocate.

(Judge Torrisi informed the jury that he would let them propose questions.)

(2) Jurors' questions need not be limited to "important matters," ... but may also seek clarification of a witness's testimony. Reining in excessive questioning may present the greatest challenge to a judge[.] ...

(Many of the jurors' questions here sought clarification of the witnesses' testimony.)

(3) The judge should "emphasize [ ] to jurors that, although they are not expected to understand the technical rules of evidence, their questions must comply with those rules, and so the judge may have to alter or to refuse a particular question."

(Judge Torrisi informed the jurors that he would only ask proper questions.)

(4) "The judge further should emphasize that, if a particular question is altered or refused, the juror who poses the question must not be offended or hold that against either party."

---

**13.** *Culkin,* 35 P.3d at 252–53 (quoting *Yeager,* 502 A.2d 980, 998–1000 (D.C.App.1985) (citations and footnotes omitted)).

**14.** 754 F.2d 512 (4th Cir.1985).

**15.** *Id.* at 516.

**16.** *Id.* at 515 n. 1, 516.

**17.** 433 Mass. 596, 744 N.E.2d 1089 (2001).

(Judge Torrisi told the jurors that he might not tell them why a question was not posed.)

(5) "[I]t is important that the jurors are told that they should not give the answers to their own questions a disproportionate weight." We suggest that the judge also instruct jurors not to discuss the questions among themselves but, rather each juror must decide independently any questions he or she may have for a witness.

(There is no indication in the record that the jurors consulted each other about questions.)

(6) "These instructions should be repeated during the final charge to the jury before they begin deliberations."

(7) All questions should be submitted in writing to the judge. We suggest that the juror's identification number be included on each question. This will enable the judge to address problems unique to a juror, as by voir dire, or to give a curative instruction without exposing the entire jury to any potential prejudice.

(Judge Torrisi retained all the proposed juror questions.)

(8) On submission of questions, counsel should have an opportunity, outside the hearing of the jury, to examine the questions with the judge, make any suggestions, or register objections. This may be done at sidebar, or the jury may be removed at the judge's discretion. The judge should rule on any objections at this time, including any objection that the question touches on a matter that counsel purposefully avoided as a matter of litigation strategy, and that, if asked, will cause particular prejudice to the party.

(Judge Torrisi discussed the jurors' proposed questions outside the jurors' hearing.)

(9) Finally, counsel should be given the opportunity to reexamine a witness after juror interrogation. The scope of the examination should ordinarily be limited to the subject matter raised by the juror question and the witness's answer. The purpose of reexamination is two fold. First, it cures the admission of any prejudicial questions or answers; and second, it

prevents the jury from becoming adversary in its interrogation.[18]

(Judge Torrisi permitted follow up questions.)

Judge Torrisi followed almost all of these guidelines. He informed the jurors that he would allow them to propose questions in writing. He told the jurors that he and the parties would review the questions and that he might not be able to tell them why he would not ask a proposed question. Judge Torrisi retained the jurors' proposed questions. The parties objected to proposed questions outside the jurors' hearing. The parties were permitted to ask follow-up questions if a juror's proposed question was allowed.

Furthermore, allowing the jurors to propose questions can give the court notice that a juror might be considering improper factors. In this case, one of the proposed questions for Landt was "[w]hy did you consult with an attorney so soon after the accident?" At this point, Landt's attorney might have asked Judge Torrisi to instruct the jury that there is nothing improper about consulting an attorney and that they should draw no negative inferences from this consultation. Landt did not request such an instruction.

■ Landt next argues that Judge Torrisi abused his discretion by allowing juror questioning without considering whether the benefits of doing so outweighed the risks of compromising her right to a fair trial. Landt relies on two opinions from the Second Circuit Court of Appeals that require district courts to find that the benefits to be gained by allowing juror questioning outweigh the risk of biasing the jury.[19]

Although Judge Torrisi did not explicitly balance the benefits and risks of juror questioning, he explained that when he first considered the practice, he shared defense counsel's concern that juror questioning might help the State to meet its burden of proof. Having used juror questioning in previous trials, however, Judge Torrisi found the practice to capitalize on jurors' ability to "notice things," to be "interested [in the trial] in a

**18.** *Britto,* 744 N.E.2d at 1105–06 (citations and footnotes omitted).

**19.** *Bush,* 47 F.3d 512; *Feinberg,* 89 F.3d 337.

common sense manner." Further, Judge Torrisi found there to be "nothing constitutionally wrong with the practice." Therefore, we conclude that Judge Torrisi did consider the risk that Landt would be prejudiced and found the benefits of juror questioning to outweigh that risk.

■ We conclude that Judge Torrisi did not abuse his discretion when he allowed the jurors to propose questions for the witnesses under the procedure he used in this trial. We wish to emphasize that this review is necessarily a case-by-case process. There may be a case where a defendant can show from the proposed questions from jurors, or the procedure adopted by the trial judge, that the questioning process prejudiced the defendant. But from our review of the record, we conclude that this is not one of those cases.

■ Finally, the State argues that even if the trial court erred by allowing juror questioning, this error was harmless. Landt argues that we should not consider whether such an error was harmless because the effects of juror questioning are impossible to identify.

But we conclude that even if Judge Torrisi erred in one or more procedural aspects of juror questioning, this error was harmless

beyond a reasonable doubt. None of the jurors' questions that were actually asked by Judge Torrisi elicited objectionable evidence. Additionally, none of the questions (either asked or rejected) involved elements of the tampering with evidence or driving while intoxicated charges. Landt was acquitted of the manslaughter and negligent homicide charges.

Allowing juror questioning did not prejudice Landt on the tampering with evidence charge because Landt testified that she helped move Shapsnikoff and because jurors submitted no questions regarding her intent. Because Landt's testimony supported a conviction on this charge, and because no juror questions considered the facts underlying the charge, we conclude that the questions actually asked could not have prejudiced her.

*Conclusion*

We AFFIRM Landt's convictions.