**Ronald K. BARR Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–10946.

Court of Appeals of Alaska.

March 14, 2014.

Hanley Robinson Smith, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Nancy Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: MANNHEIMER, Chief Judge, ALLARD, Judge, and HANLEY, District Court Judge.*

*OPINION*

ALLARD, Judge.

Ronald K. Barr Jr. was convicted of physically and sexually assaulting M.B. Barr appeals his convictions, arguing that the superior court erred when it asked one of the State's expert witnesses a question submitted by a juror: whether the injuries to M.B. constituted the "worst beating" the expert had seen in Northwest Alaska. Barr also argues that the superior court committed plain error when it permitted the prosecutor to make statements during closing argument that Barr's claims were an indirect comment on his failure to take the stand.

For the reasons explained below, we conclude that the juror's question was improper and should not have been allowed, but that the error was harmless in this particular instance. We further conclude that Barr has failed to show plain error with respect to the prosecutor's comments. We therefore affirm Barr's convictions.

*Background facts*

Ronald Barr and M.B. are residents of a village near Kotzebue who have engaged in a consensual sexual relationship in the past. On two separate occasions in March 2010, M.B. reported being physically and sexually assaulted by Barr.

She reported that the first incident occurred on March 14, 2010. Barr invited M.B. to his house to drink. She drank heavily and became intoxicated. Barr indicated to M.B. that he wanted to have sexual intercourse; she did not want to. He engaged in vaginal penetration with her and she tried to fight him off, but he choked her until she nearly passed out. When Barr stopped choking her, M.B. pushed him off and went to another room. Barr then dragged her by her shirt or hair back into the bedroom and had sexual intercourse with her again.

After Barr fell asleep, M.B. ran next door wearing only pants because she was scared that if she retrieved more of her clothing Barr would wake up. The next morning, M.B. found a mark on her arm that looked like a bite mark, her throat hurt (it was a few days before she was able to swallow properly), and her eyes and neck were very red. M.B. went to Barr's house and showed him her injuries. He told her that the mark on her arm occurred when she fell on a water pipe. When M.B. told Barr that he had almost killed her, he hugged her, apologized, and promised that he would not do it again.

A week later, on March 24, Barr held a small social gathering at his house. The group, which included M.B., spent the evening drinking, smoking marijuana, and playing and recording music.

M.B. became very intoxicated as the night progressed. She later testified that she recalled Barr dragging her into the bedroom and slapping her head several times with his hands. He took her clothes off and engaged in vaginal penetration with her after she told him she did not want to have sexual intercourse. The next thing M.B. remembered was waking up on the floor with Barr sleep-

ing on the bed nearby. She was in a lot of pain.

M.B. was later examined by the local health aide, Kathleen Tebbits. Tebbits observed that M.B. had bumps on her head, a deviated nose, a black eye that had swollen shut, blood crusted on her mouth, injuries to her throat and back, and bruising on her face, arms, and legs. M.B. had difficulty speaking, but she was able to tell Tebbits that Barr had beaten her up and raped her.

Tebbits called the troopers, who arranged for M.B. to be medevaced to Kotzebue and then to Anchorage, where she remained for two weeks.

At the Alaska Native Medical Center in Anchorage, Dr. Frances Wilson treated M.B. Dr. Wilson testified that M.B. had a broken nose and broken bones in the area around her left eye. M.B. required surgery to reestablish the symmetry of her face. Dr. Wilson testified that M.B. reported being beaten, and that her injuries were consistent with that claim.

While at the hospital, M.B. was also examined by Krista Croy, who testified at Barr's trial as an expert in forensic nursing. Over the course of her examination, Croy observed bruising on M.B.'s shoulders, chest, back, and lower extremities. M.B. also had injuries and reported pain on her head and neck. While some of the bruises on M.B.'s body appeared older, the bruises to her face were red and purple, indicating that they were caused more recently. In Croy's opinion, M.B.'s injuries were consistent with her report that she had been beaten by someone's hands.

On March 29, Trooper Nieves went to Barr's home and interviewed him. The interview was recorded and played for the jury at trial. Although Barr initially denied having sex with M.B., Barr later stated that they had consensual sex and that M.B. had initiated it. Barr denied hitting M.B. He claimed she had injured herself falling down while inside the bathroom or on her way out of the bathroom.

1. AS 11.41.410(a)(1).

2. AS 11.41.210(a)(1).

*Trial court proceedings*

Barr was indicted on one count of first-degree sexual assault [1] and one count of second-degree assault [2] based on his conduct on March 14, and one count of first-degree sexual assault and one count of first-degree assault [3] based on his conduct on March 25.

Prior to trial, Superior Court Judge Paul A. Roetman informed the parties that he would allow the jurors to submit written questions at the close of each witness's testimony, and that the parties would have the opportunity to object to these questions. During trial, Barr objected to a question proposed by a juror at the end of testimony from Krista Croy, the forensic nurse from the Alaska Native Medical Center. Croy had testified regarding her observations of M.B.'s injuries. The juror's question was: "Is this one of the worst beatings you've seen from Northwest Alaska?"

Barr objected to the form and the substance of the question. He argued that the question was leading (*i.e.*, it assumed that M.B.'s injuries were the result of a beating and not accidental) and that the question was irrelevant.

The court overruled Barr's objections. The court found that the question was relevant because "it goes to [Croy's] experience." The court proceeded to ask the question. Croy replied that she had only been involved in a few cases from Northwest Alaska, but that this was "a pretty bad case."

The jury subsequently acquitted Barr of the charges relating to the March 14 incident, but convicted Barr of the charges stemming from the March 25 incident.

This appeal followed.

*The trial court erred by submitting the juror question to the State's expert witness, but the error was harmless beyond a reasonable doubt*

3. AS 11.41.200(a)(1).

In *Landt v. State*,[4] this Court held that trial judges have discretion to allow jurors to ask questions of witnesses in a criminal trial.[5] We emphasized, however, that procedural safeguards are necessary to ensure that the juror questions do not violate a defendant's rights to a fair trial and an impartial jury.[6] We provided a detailed list of the types of procedural safeguards that the trial court should consider if it allows juror questioning. Those safeguards include: (1) instructing the jurors that they must remain neutral and impartial and should not assume the role of an investigator or advocate; (2) requiring the jurors to write out their proposed questions and providing an opportunity outside the presence of the jury for the parties to review the proposed questions and make objections and/or suggest alterations; (3) informing the jurors in advance that the judge might decide not to ask a proposed question or might alter the question to comply with the rules of evidence. In this context, we advised trial judges to tell the jurors not to speculate as to why a particular question was altered or not asked, and to not be offended or hold this against either party.[7]

At Barr's trial, the superior court employed procedures similar to the ones we approved in *Landt:* the judge had the jurors submit individually written questions that the court then reviewed, with counsel, out of the presence of the jury. The judge also informed the jurors that their questions would have to conform to the applicable rules of evidence and that a particular question might therefore be altered or not given at all.

We nevertheless conclude that the trial judge abused his discretion by asking Croy the question at issue here: "Is this one of the worst beatings you've seen from Northwest Alaska?" The relevance of this question is not clear. The trial judge speculated that the juror was asking about Croy's "experience" and "how many people she's actually seen." But the juror's question did not ask about Croy's experience or credentials; it asked only about the severity of M.B.'s "beating" in comparison to other "beatings" Croy had seen.

The State suggests that the severity of M.B.'s injuries was relevant to prove that the injuries were caused by intentional conduct rather than by accident. But again, that is not how the question was framed. Croy was not asked for her opinion on whether M.B.'s injuries were consistent with an assault (an opinion Croy had already offered during direct examination); the juror's question *assumed* an assault had occurred, and asked only whether it was a particularly bad one. The comparative severity of M.B.'s injuries to those inflicted in other cases was not probative of any material issue in Barr's trial.

An even more fundamental problem with the question is that it assumed the truth of a primary element of the State's case. The crux of Barr's defense was that M.B. hit her face when she fell in the bathroom in a state of extreme intoxication. By asking whether the "beating" M.B. received was especially severe, the question signaled that the juror had rejected Barr's version of events and already formed the opinion that Barr was guilty of assault. When the trial judge read the juror's question in open court, the juror's opinion of the evidence was broadcast to the rest of the jury well in advance of the jury's deliberations. This was improper.[8]

We therefore turn to the question of whether Barr was prejudiced by this error. Barr urges us to adopt the reasoning of the Minnesota Supreme Court, which held that harmless error analysis is inappropriate in

4. 87 P.3d 73 (Alaska App.2004).

5. *Id.* at 80; *see also Commonwealth v. Britto*, 433 Mass. 596, 744 N.E.2d 1089, 1103 (2001) (affirming judge's decision to permit juror questioning, and collecting cases from the majority of jurisdictions similarly upholding the practice); Jonathan M. Purver, Annotation, *Propriety of Jurors Asking Questions in Open Court During Course of Trial*, 31 A.L.R.3d 872, § 3 (1970) (collecting cases holding that the trial judge has discretion to allow juror questioning of witnesses).

6. *Landt*, 87 P.3d at 78–79.

7. *Id.*

8. *Id.* at 78 (noting the risk that broadcasting improper questions will undermine jury impartiality).

this type of case because an improper juror question could "affect the outcome of a criminal case in subtle ways that go directly to the neutrality and impartiality of a juror" and "it is impossible to quantify the effects of the error." [9] For those reasons, the Minnesota Supreme Court held that juror questioning during criminal trials was impermissible and required automatic reversal on appeal.[10] But we previously rejected this *per se* reversal standard in *Landt.*[11] We note that Minnesota remains among the few jurisdictions that do not allow juror-initiated questioning of witnesses in criminal trials.[12]

In *Landt,* we did not directly determine what standard of harmless error review should apply when a court commits error in the procedural aspects of juror questioning because we concluded that, even if the court erred in *Landt,* the error was harmless beyond a reasonable doubt.[13] A different question is presented here because the trial court followed all the proper procedures but nevertheless allowed an improper juror question over defense objection. In this situation, a case-by-case analysis will normally be required to determine whether the juror's question (or the answer to the question) implicated the defendant's right to an impartial jury, or some other constitutional right, and whether the court took action to cure any prejudice to the defendant's case. Some cases may require a determination that the error was harmless beyond a reasonable doubt, while other cases may require some other, lower standard of harmlessness.

We do not decide in this case what harmless error standard should apply to our review of the superior court's error in allowing the improper juror question because the parties have not briefed the issue, and because we conclude that the error was harmless beyond a reasonable doubt.

When the trial judge asked Croy whether Barr's assault on M.B. was one of the "worst beatings" she had seen in Northwest Alaska, the jury had already heard testimony from three medical witnesses who had personally examined M.B.: Public Health Aide Tebbits, Dr. Wilson, and Nurse Croy. All three witnesses described extensive injuries to M.B.'s head, face, neck, arms, and lower extremities. M.B. told these individuals that she had been beaten, and Dr. Wilson and Croy testified that M.B.'s injuries were consistent with her report of an assault. Although Barr's counsel cross-examined the witnesses on whether they had been asked by anyone to determine if the injuries were also consistent with an accidental fall, the attorney never actually asked the witnesses to offer an opinion on this question. Nor did Barr present any expert testimony of his own suggesting that M.B.'s extensive injuries could be consistent with his claim of accident.

Furthermore, Croy's only response to the juror's question was to say that this was "a pretty bad case." This testimony merely reiterated what the evidence had already shown: that M.B. sustained serious injuries. Croy said she had only been involved in a few cases in Northwest Alaska, so she could not offer an opinion on how M.B.'s case compared with other cases in the region. Given this record, we conclude that there is no reasonable possibility that the evidence elicited by the juror question—the evidence that this was a "pretty bad case"—affected the jury's verdict.[14]

Quantifying the potential prejudice of *asking* the juror question—and by doing so, broadcasting the juror's premature assessment of the merits of the State's case—is more difficult. As we have previously stated, "we have no doubt that there are many trials in which one or more members of a jury prematurely remark on the credibility of the

9. *State v. Costello,* 646 N.W.2d 204, 215 (Minn. 2002).

10. *Id.*

11. *Landt,* 87 P.3d at 80.

12. *Costello,* 646 N.W.2d at 214; *see also Landt,* 87 P.3d at 77 & n. 7 (listing jurisdictions where this practice is prohibited); Jonathan M. Purver, Annotation, *Propriety of Jurors Asking Questions in Open Court During Course of Trial,* 31 A.L.R.3d 872, § 3.5 (1970) (same).

13. *Landt,* 87 P.3d at 80.

14. *See Smithart v. State,* 988 P.2d 583, 589 (Alaska 1999).

testimony they have heard or express some opinion about the anticipated outcome of the case." [15] Although such remarks are improper, "they do not suggest that the ensuing deliberations are tainted or that the resulting verdict should be distrusted." [16] We think there is no reasonable possibility that one juror's premature characterization of the evidence as a "beating" during the presentation of the State's case led the jury in its later deliberations to disregard the evidence, the State's burden of proof, or the court's instructions.

We therefore conclude that the court erred by asking the juror question over defense counsel's objection, but that the error was harmless beyond a reasonable doubt.

*The prosecutor's rebuttal argument was not an impermissible comment on Barr's right to remain silent*

■ During the prosecutor's rebuttal argument, the prosecutor argued that Barr had provided "no explanation" for M.B.'s injuries. Although Barr's attorney did not object to this argument at trial, Barr now claims the remark was an adverse comment on his decision not to testify, and that the superior court committed plain error when it failed to take corrective action *sua sponte.*

We note first that the prosecutor's statements directly responded to statements made by Barr's defense attorney. During opening statements, Barr's defense counsel told the jury it would hear directly from Barr and that Barr would testify that M.B.'s injuries were from falling down. In closing argument, Barr's counsel referred to this earlier promise and argued that the jury *had* heard directly from Barr—because his recorded interview with the troopers was played to the jury almost in its entirety. Barr's counsel explained that Barr had originally intended to take the stand and testify, but that after the prosecutor played Barr's interview, Barr and his counsel had decided that Barr's testimony was no longer neces-

sary and would simply further delay getting the case to the jury. Barr's counsel also asserted that Barr's contemporaneous statements to the trooper were "much more reliable" than any trial testimony, and that there was therefore no reason to put Barr on the stand "to repeat exactly what the jury [had] already heard."

In rebuttal, the prosecutor stated the following:

Now, one interesting thing about what we've just heard in the defense is what really didn't say [sic]. There's no explanation. Certainly, one would wait to hear something like that. How would a pattern of injuries apparently inflicted over time occur? You're about to go back and look at all those pictures. How else would that occur if they weren't imposed intentionally by someone who had the opportunity to do so?

. . . .

Now, there's simply no explanation—alternative explanation that's been offered at this point. When the idea that [M.B.] came in her[e] and told you about these episodes and what happened to her at great emotional expense to herself because she'd fallen down one time is frankly ridiculous.

Barr's counsel did not object to any of these statements. On appeal, however, Barr argues that these statements constituted an impermissible comment on his constitutional right not to testify. We disagree.

Viewed in context, the prosecutor's statements appear to be (1) a direct response to the defense attorney's contention that Barr fully explained M.B.'s injuries when he was interviewed by the troopers; and (2) fair comment on the inadequacy of Barr's explanation to the troopers, rather than an attack on Barr's decision not to testify, or an invitation to the jury to shift the burden of proof to Barr.[17]

**15.** *Larson v. State,* 79 P.3d 650, 656 (Alaska App.2003).

**16.** *Id.; see generally United States v. Resko,* 3 F.3d 684, 688–89 (3d Cir.1993) (discussing the

reasons for the prohibition on premature deliberations in a criminal case).

**17.** *See, e.g., Hill v. State,* 902 P.2d 343, 346–47 (Alaska App.1995); *Hilburn v. State,* 765 P.2d 1382, 1390 (Alaska App.1988).

Even if the prosecutor had commented more directly on Barr's failure to testify, we would not necessarily find error, given that Barr expressly told the jury he decided not to take the stand because his testimony would add nothing to the statement he gave the police. In *Hilburn v. State*,[18] we held that this defense argument opened the door to considerably more direct comment by the prosecutor on the defendant's failure to testify.[19]

As in *Hilburn*, the jury in this case was instructed on Barr's constitutional right not to testify, and the jury was told not to draw any inferences of guilt from the fact that he did not testify.[20] While we acknowledge that the line between fair comment on the evidence and adverse comment on a defendant's constitutional right to remain silent can be imprecise, we do not view the prosecutor's comments in this case as error, much less obvious error requiring the trial court to act *sua sponte* in the absence of a defense objection.[21]

*Conclusion*

The superior court's judgment is AFFIRMED.

---

**18.** 765 P.2d 1382.

**19.** *Id.* at 1389–90.

**20.** *See id.* at 1390.

**21.** *See Khan v. State,* 278 P.3d 893, 900 (Alaska 2012) ("[I]n order for a court to find plain error, the error must not be the result of an intelligent waiver or a strategic decision not to object; (2) the error must affect substantial rights; (3) the error must be obvious; and (4) the error must be prejudicial.") (quoting *Adams v. State,* 261 P.3d 758, 771 (Alaska 2011)).